**EAC CREDIT CORPORATION,**
**Plaintiff-Appellee,**

v.

**E. L. KING et al., Defendants,**

**Jess Porter and Joyce Porter,**
**Defendants-Appellants.**

**No. 73–3998.**

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1975.

**1234**

Earl Keyes, Jackson, Miss., for defendants-appellants.

Harmon W. Broom, Jackson, Miss., for plaintiff-appellee.

W. E. Gore, Jr., Jackson, Miss., for other interested parties.

Before COLEMAN, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

In this diversity based action EAC Credit Corporation (EAC) sued to recover financing losses under guaranty agreements which had been executed by the Kings and the Porters in connection with their business operations in Jackson, Mississippi. A jury returned verdicts for EAC on the first three counts of the complaint; the court directed a verdict for defendants on the fourth count. From a judgment imposing joint and several liability against all four defendants in the amount of 50,994.00 dollars, only the Porters have appealed. We affirm on the first two counts and reverse on the third.

I

In late 1965, Mr. King and Mr. Porter, who were then doing business as Jackson Maytag Company, approached EAC with a request for financing in connection with their sales of Speed Queen washers and driers.[1] EAC agreed to provide "floor plan" financing[2] for Speed Queen products, but after reviewing the financial statements of Jackson Maytag, EAC insisted that the account be undergirded by personal guaranties. Accordingly, Mr. Porter and Mr. and Mrs. King each signed separate documents. The document signed by Mr. Porter on September 16, 1965 contained the following pertinent provisions:

> I do hereby guarantee to said EAC Credit Corporation, the prompt payment of any and all indebtedness now due or hereafter to become due to the said EAC Credit Corporation, to the extent of a total of $40,000 covering purchases and loans secured by Speed Queen inventory to Jackson Maytag Company, its successors and assigns, for any such goods which may be purchased, shipped, or ordered at any time in the future.

> \* \* \* \* \* \*

> This guarantee shall apply only to merchandise financed on a "floor plan" basis whereby the inventory is being financed for resale and for rental.[3]

When Jackson Maytag Company sought to begin handling Speed Queen products, the Maytag distributor insisted that "Maytag" be removed from the company name. Accordingly, in December 1965 the articles of incorporation of Jackson Maytag Company were amended to change the corporate name to "King-Porter Company, Inc."

In April 1968 King and Porter decided to expand their dealings in Speed Queen

---

1. EAC Credit Corporation and Speed Queen are both divisions of McGraw-Edison Company.

2. Under this plan EAC was to pay Speed Queen for the merchandise and take a trust receipt on goods shipped to Jackson Maytag. Jackson Maytag was to pay EAC 10% of the invoice price immediately upon the sale or rental of each item, and the balance within ninety days thereafter. In practice, a representative of EAC made a weekly check of the Jackson Maytag inventory against the trust receipts and Jackson Maytag was then billed for any item of merchandise that appeared on the trust receipts but was not in its stock.

3. Although executed contemporaneously with Mr. Porter's, the guaranties signed by the Kings are significantly different in coverage. The crucial provision in their guaranties reads as follows:

> I (we) do hereby guarantee to the said EAC Credit Corporation the prompt payment of any and all indebtedness now due or hereafter to become due to the said EAC Credit Corporation from the said Jackson Maytag Co. [its successors and assigns] for any goods which may be purchased, shipped, or ordered at any time in the future.

merchandise to include commercial coin-operated washers and driers. Speed Queen .was agreeable, but company policy required that such commercial operations be kept separate from retail sales. Hence, King, Porter and a third man, Mr. Tymes, formed "King-Porter Service Company, Inc." to handle the commercial merchandise. At about the same time, King and Porter incorporated "King-Porter, Inc." to operate a second retail store in Jackson. In February 1969, a third business was incorporated as "King-Porter, Corp.", which, like the second retail store, sold hardware as well as appliances. Mr. King testified that each store was incorporated separately because each had different management and because they wanted to facilitate divestiture in case one location proved unprofitable. Three of the four corporations listed 426 North State Street as the address of their initial registered offices, although only one, King-Porter Co., Inc., actually conducted business at that location.

King and Porter were each fifty percent shareholders in three of the four business corporations; Tymes owned a one-third interest in King-Porter Service Co., Inc. Mr. King and Mr. Porter were respectively president and vice-president of each corporation, although only King took an active part in their operation. Neither of their wives owned an interest in any of the companies.

In 1968 two additional financing arrangements were effectuated. EAC agreed to extend floor plan financing for non-Speed Queen merchandise to be delivered to the King-Porter companies through purchases by EAC from McKee & McRae, Inc., a wholesale distributor in Jackson. EAC also agreed to provide "retail installment" financing under a plan whereby EAC would purchase installment contracts and rental agreements from the King-Porter companies on a non-notification basis, i. e. no notice of the financing transaction would be given to the retail appliance purchaser and the companies would collect payments on the contracts as they fell due.

A second guaranty, executed by both Mr. and Mrs. Porter, was entered into contemporaneously with this additional financing. The terms of this guaranty, dated August 29, 1968, are set out in the margin.[4] The italicized portions represent terms that were typewritten into blanks on a mimeographed document prepared by EAC. The entire final paragraph was also added to the form in

---

4. For and in consideration of the sum of One Dollar, paid to the undersigned the receipt whereof is hereby acknowledged, and in consideration of the granting of credit and financing by Speed Queen, a Division of McGraw-Edison Company, or EAC Credit Corporation, both hereinafter referred to as "McGraw" to *King Porter Co., et al, its successors and assigns* of *Jackson, Miss.*

I (we) do hereby guarantee to the said "McGraw" the prompt payment of any and all indebtedness now due or hereafter to become due to the said "McGraw" from the said *King Porter Co., et al* for any goods which may be purchased, shipped, or ordered at any time in the future.

It is understood and agreed that this guarantee shall be a continuing guarantee and shall remain valid and cover all purchases until ten days after receipt by the said "McGraw" of a written notice from the undersigned that this guarantee has terminated.

The undersigned further consents to, and waives notice of any extension or extensions that may hereafter be granted by the said "McGraw" to the said *King Porter Co., et al* by the acceptance of notes or otherwise of the payment of indebtedness which is secured by this guarantee.

This guarantee shall be considered and deemed to be in addition to any other guarantee of any other kind or character held by the said "McGraw", or which it may hereafter secure, and shall not in any wise be affected thereby.

It is understood and agreed that the execution of this guarantee by me (us) is notice to me (us) of this acceptance and no further notice of its acceptance is required. I (we) do hereby guarantee to the said "McGraw" the prompt payment of any and all indebtedness now due or hereafter to become due to the said "McGraw" from the said King Porter Co. for any accounts receivable of the said King Porter Co. against which "McGraw" has or will advance funds.

typing but with a style of type different from that used to fill in the blanks. Both Mr. and Mrs. Porter testified that at the time they signed this guaranty the blanks were not filled in. Mr. Porter testified that he signed "on the basis of the last paragraph" only. W. A. Royce, Jr., the EAC representative in charge of dealer financing for Speed Queen and the man from whose office the guaranty originated, testified that the second guaranty was prepared "with reference to" the final paragraph. The copies of this guaranty attached to the complaint and identified by Royce at his deposition did not have the blanks filled in. Royce also testified that the furnishing of personal guaranties was a condition precedent to the financing of the King-Porter Company operations by EAC and indicated that he considered any debt owed to EAC by any King-Porter Company ipso facto covered by the guaranties.

 Under Mississippi law a guarantor is entitled to have his undertaking strictly construed, and the contract cannot be extended beyond its precise terms. American Oil Company v. Wigley's Estate, 251 Miss. 275, 169 So.2d 454 (1964). The person claiming under the guaranty has the burden of showing that the debt whose recovery is sought falls within the contractual terms and that all conditions upon the guarantor's liability have occurred. However, the subjective beliefs and intentions of the parties are relevant to the extent necessary to interpret ambiguities in the written document; and to this end, matters extrinsic to the writing may properly be considered by the trier of the facts.

## II

 The claims of Counts I and II of the complaint were made up of sums owed to EAC by various individual debtors of the King-Porter companies whose merchandise purchase and rental accounts had been acquired by EAC pursuant to the installment financing agreement.[5] Plaintiff's Exhibit No. 4 was a list of seventy-one names, each accompanied by an account number and an amount representing the uncollected balance due. This tabulation constituted the only physical evidence in support of the claims made in Count I. Royce testified that the list represented people who owed money to "King-Porter Company" on installment contracts or leases. The supporting documents were offered as evidence but were later withdrawn. Plaintiff's Exhibit No. 4 was properly admissible as a summary of the accounts, which were physically in court and available for inspection. See New Amsterdam Cas. Co. v. W. D. Felder & Co., 214 F.2d 825 (5th Cir. 1954); Proposed Federal Rules of Evidence, Rule 1006, 56 F.R.D. 183, 345–346 (1973).[6] Count II was supported by Plaintiff's Exhibit No.

---

**5.** Count II of the complaint charged "that the defendants pledged fraudulent contracts to the plaintiff; that each and every one of said contracts were fraudulently misrepresented to the plaintiff to procure the respective sums set forth in the sworn itemized statement attached hereto . . . ."

After hearing the evidence, the court below indicated a belief that fraud was not the basis of liability. The jury received an instruction on the need for clear and convincing proof to sustain a finding of fraud as well as another instruction, to apply if they found no fraud, on the need for proof by a preponderance of the evidence that the accounts involved were part of the installment financing scheme. When the jury later expressed confusion regarding what burden of proof to apply, the judge instructed them to disregard the allegation of fraud in Count II.

The Porters have raised no complaint here regarding the jury instructions. Cryptic as they were, the instructions ultimately correctly guided the jury's deliberations since the fraud theory of liability was not supported by the evidence. On this appeal we treat Count II as presenting a theory of liability identical to that of Count I.

**6.** On cross examination by counsel for the Kings, Royce examined the documents which corresponded with the first name on the list. He described the basic document as a sales contract and security agreement naming King-Porter Company, Inc. as the secured party, with a notation on its reverse side of assignment to EAC by King-Porter, Inc. He added that all the items in support of Count I were of a similar nature.

5, which contained another list of debtors. However, this exhibit also included a conditional sales contract or rental agreement corresponding to every name on the list. Each contract or agreement is stamped "Assigned to EAC Credit Corp. by" next to King-Porter Co., Inc.'s name. All of the rental agreements and most of the contracts contain the statement that they are assigned with recourse.

Mr. Porter's September 16, 1965 guaranty is expressly limited to merchandise financed on a "floor plan" basis (see note 2) and cannot supply the source of liability on these debts. Hence, any recovery against the Porters on the first two counts must be predicated on the final paragraph of the August 29, 1968 document (note 4, *supra*) which guaranteed certain accounts receivable. The Porters claim that the debts sued on are not "accounts receivable . . . against which [EAC] has or will advance funds". They contend that the term "accounts receivable" is limited to sums owed on open account, and specifically that it does not include debts evidenced by chattel paper of the sort upon which Counts I and II are based. Royce admitted that this type of chattel paper might more appropriately be described as "contracts receivable", but maintained that the term as used in the guaranty covered what was in fact transferred.

■ The words of a guaranty agreement are to be given their ordinary meaning in the absence of an indication that they were used in a special sense. *Cf.* Miller v. Fowler, 200 Miss. 776, 28 So.2d 837 (1947); Bank of McLain v. Pascagoula Nat. Bank, 150 Miss. 738, 117 So. 124 (1928). A guaranty should be interpreted in accord "with the intention of the parties, as manifested by the terms of the guaranty, in connection with the subject matter and surrounding circumstances, neither enlarging the words beyond their natural import in favor of the creditor nor restricting them in aid of the [guarantor]." Wingo-Ellett & Crump Shoe Co. v. Naaman, 175 Miss. 468, 167 So. 634 (1936).

> [T]he words should receive a fair and reasonable interpretation, so as to attain the objects for which the instrument is designed and the purposes to which it is applied. We should never forget that letters of guaranty are commercial instruments—generally drawn up by merchants, in brief language—sometimes inartificial, and often loose in their structure and form; and to construe the words of such instruments with a nice and technical care would not only defeat the intentions of the parties, but render them too unsafe a basis to rely on for extensive credits so often sought in the present active business of commerce throughout the world.

Lawrence v. McCalmont, 2 How. (U.S.) 426, 11 L.Ed. 326 (1844).

In support of their contention that the term "accounts receivable" has a fixed, unambiguous commercial meaning, the Porters draw on a substantial body of case law as well as the Uniform Commercial Code. Where it has been necessary to define the term without reference to intent the courts have generally concluded that it applies only to sums due on open account not evidenced by a security agreement or other writing which reduces the debt to a stated amount.[7]

■ Prior to adoption of the Uniform Commercial Code by Mississippi in 1968, a definition of accounts receivable consistent with the Porters' claim appeared in a Mississippi statute that applied to the assignment of accounts receivable.[8]

---

**7.** *See* In re Varney Wood Products, Inc., 327 F.Supp. 425, 427 (W.D.Va.1971), rev'd, 458 F.2d 435 (4th Cir. 1972); 1A Words and Phrases, "Accounts Receivable."

**8.** Accounts receivable shall be deemed to include a right to sums due or to become due on open accounts or contracts. It excludes sums due on and rights represented by judgments, notes, bills of exchange, drafts, acceptances or other negotiable or non-negotiable instruments or agreements for the payment of money, the transfer of which is commonly made by endorsement on and delivery of the instrument or contract or insurance policies; also sums due under and rights represented by a chattel mortgage, bill of sale to secure debt, conditional sales contract, or other instrument reserving

Even if this statute had been in effect in August, 1968 when the second guaranty was signed, it would not preclude a finding of a broader use of the term in the guaranty agreement. The statutory definition does not purport to limit or define these words for all contract usages. The agreement we interpret today does not assign the accounts, but only uses the term to describe an independent transaction.

The Uniform Commercial Code does not define "accounts receivable", but does by implication perpetuate the prior usage in UCC Section 9–106, Miss.Code Ann. § 75–9–106, where "account" is defined to mean "any right to payment for goods sold or leased . . . which is not evidenced by an instrument or chattel paper." Chattel paper is defined in Section 9–105, Miss.Code Ann. § 75–9–105, to mean "a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods." The official comments to the Code, not included with the Mississippi codification, define "account" as used in the UCC to mean the "ordinary account receivable." [9]

■■ It is clear from an examination of Plaintiff's Exhibit No. 5 that the debts involved in Counts I and II would fall within the Code definition of "chattel paper" rather than "accounts".[10] If we were concerned here with the transfer of paper between the King-Porter

companies and EAC, the transaction would fall expressly within the Code's ambit,[11] and EAC would be bound to the Code's meaning of the term chosen. The execution of a guaranty is not a Code transaction. A guaranty is not a "transaction . . . which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts." Miss. Code Ann. § 75–9–102(1)(a) (1972). Neither does a guaranty of accounts receivable fall within the coverage of Article 3 of the UCC, Miss.Code Ann. §§ 75–3–101 to 75–3–805 (1972), the formalities of which apply only to guaranties of commercial paper. See Cities Service Oil Co. v. Collins, 121 Ga.App. 38, 172 S.E.2d 653 (1970). Thus the definitions contained in the Code can only be evidence of what the parties might have intended. Without the compulsion of statutory definition, the meaning of the term is not so well settled or so clearly inapplicable to the transactions sued on that we could say, as a matter of law, that the parties could not by using it have contemplated the individual account balances created by the sales and leases that took place here. See Annot., 41 A.L.R.2d 1395.

■ The court below refused a request by the Porters that the jury be instructed that there were no accounts receivable purchased from King-Porter Company. No definition of accounts re-

---

title to or creating a lien upon property; sums due or to become due from the United States of America or any department or agency thereof; and sums arising from public or private construction contracts for which the assignor has furnished a surety bond guaranteeing the performance of the contract or the payment of labor and material claims arising therefrom.

Miss.Code Ann. § 243–01 (1942), repealed by Laws, 1966, ch. 316, Miss.Code Ann. § 75–10–102(1)(e) (1972), effective on and after March 31, 1968.

**9.** See In re Varney Wood Products, Inc., 458 F.2d 435 (4th Cir. 1972).

**10.** Examination of the Exhibit 5 documents reveals that the conditional sales contracts

are standard Uniform Commercial Code security agreements by which King-Porter Co., Inc., retained a security interest in the transferred merchandise. The rental agreements provide for application of the rental fees against the item within 90 days; alternatively, a renter could purchase the merchandise for one dollar after a designated number of rental payments.

**11.** Miss.Code Ann. § 75–9–102(1)(a), (b) (1972); see Official Comment 2: "Commercial financing on the basis of accounts and chattel paper is often so conducted that the distinction between a security transfer and a sale is blurred, and a sale of such property is therefore covered by subsection (1)(b) whether intended for security or not. . . ."

ceivable was submitted or given. The court did instruct the jury that if they believed that the August 29, 1968 agreement was intended to cover only accounts receivable, and if they also found there were no accounts receivable in the case, then they should find for the Porters on that particular guaranty. This procedure properly left to the jury the determination of what the parties intended to include within the ambiguous phrase. By their verdict the jury concluded that the term was meant to encompass any "receivable" whether or not secured. This conclusion is supported by Royce's testimony and offers no basis for reversal.

 Further pursuing their defense that the guaranty language excluded these transactions, the Porters deny that there is any evidence that EAC advanced funds against the paper submitted in support of Counts I and II. They contend that to "advance funds" means to furnish money and take the accounts receivable as collateral, and that the evidence clearly establishes that EAC *purchased* the receivables from King-Porter. Royce's testimony on this point was unclear. Several times he represented that EAC bought the receivables from the King-Porter companies, but he also stated that EAC loaned money and took the contracts and leases as "additional collateral." No documentary evidence, such as cancelled checks or a security agreement on the transferred paper, was offered to clarify the nature of the actual transfer.

However, the Porters' attempt to draw a distinction between the sale of a receivable and its transfer as security for a loan is unpersuasive. Like "accounts receivable", the contract phrase "advance funds" has no fixed legal meaning, and its application here raised an issue of fact. Under the Porters' own interpretation the condition may be found to have been satisfied because there is evidence in the record, in the form of Royce's testimony, that EAC did advance funds against the receivables. But, the jury could also properly find, from all the circumstances, that the parties intended the agreement to cover EAC's outright purchase of accounts. Whether the transfer could technically be denominated a loan or a sale, the jury's verdict placed these transactions within the coverage of the guaranty.

The Porters further contend that the record contains no evidence that some definite amount of money was ever furnished by EAC to the King-Porter companies in return for the receivables, or that any money furnished was never repaid. The record confirms that no documentary evidence was introduced by which the amounts received by the King-Porter companies can be calculated. Royce did indicate, however, that the receivables involved in Counts I and II were part of the installment financing arrangement, the essence of which was the exchange of money for the accounts. When asked to describe the mechanics of the financing operation, Royce stated that "in the case of the accounts receivable, the items of counts one and two, the money was advanced from our office in Cincinnati to King-Porter. . . ." Neither King nor Porter denied the authenticity of the paper underlying either count or its transfer in connection with the installment financing plan. On the contrary, Mr. King testified that EAC "bought" contracts from each of the companies. Further evidence that the transfers took place is to be found in the notation on each document of its assignment to EAC. Royce also testified that none of the debts claimed in the four count complaint had been paid.

 Proof of the precise sum received by the King-Porter companies as consideration for the receivables is superfluous to a determination of the fact of a transfer of funds. The testimony summarized above provided substantial evidence from which the jury could infer that money was in fact furnished by EAC pursuant to the installment financing agreement described in the

guaranty.[12] Moreover, the Porters' failure to raise in their motion for a directed verdict an issue as to the sufficiency of the evidence to prove this element of the plaintiff's case precludes our consideration of the contention on this appeal. House of Koscot Dev. Corp. v. American Line Cosmetics, Inc., 468 F.2d 64 (5th Cir. 1972).

Finally, the Porters deny that there is any evidence to show that the receivables involved in Count I represent debts owed to "King Porter Co.", as specified in the guaranty, and not to one or more of the other three similarly named corporations. The parties did little at trial to clear up the confusion surrounding the four similarly named corporations. In their answer to the complaint the Porters claimed that "King Porter Co." as used in the guaranty referred only to King-Porter Service Co., Inc. However, Mr. Porter testified at trial that he intended to guarantee only the receivables of King-Porter Co., Inc., and that he would not have signed had he thought he was guaranteeing the accounts of all four corporations. Royce testified that EAC extended credit to "King-Porter" and did not distinguish between the four corporations for financing purposes. King admitted that the operations of all four stores were supervised at the North State Street office. Further, the proof showed that the bankruptcy proceedings for all four corporations were consolidated because of the hopeless confusion and intermingling of the records for each. While in less confusing circumstances, the name used in the guaranty might well be held to refer only to the one corporation it most closely resembled, the proof here, taken in the light most favorable to the verdict, as it must be, discloses enough evidence of intercorporate dealings by these common officers to permit the jury to conclude that the guarantee was intended to cover the retail installment financing of all four corporations. This being the case, it is immaterial that there is no specification of which corporation sold the accounts alleged in Count I. The jury might conclude either that the parties used "King Porter Co." as a generic appellation for all four corporations, or that, as to EAC, all financing was obtained through King-Porter Co., Inc. and hence *any* receivables which were the subject of financing were receivables of King-Porter Co., Inc. The evidence would support either rationale, and either answers the Porters' objection.

### III

Count III concerned floor plan merchandise obtained from McKee & McRae. The goods were of various brands, but did not include any Speed Queen appliances. A total of over 41,000 dollars worth of such goods were repossessed by McKee & McRae on EAC's behalf at the time petitions in bankruptcy were filed for all four corporations. McKee & McRae offered to purchase the goods for about 31,000 dollars; the 10,365.72 dollars claimed in Count III thus represents the difference between the amount owed to EAC by King-Porter on the goods, and the amount received from McKee & McRae, and cannot be traced to specific items of merchandise.

Although this sum is transparently a debt owed to EAC by some or all of the King-Porter companies, it is altogether unclear under which guaranty its recovery is premised. EAC did not specify at trial, and the Porters reassert here their claim that neither guaranty they signed was understood to cover this debt. The

12. In EAC's brief on appeal appears a statement that "[t]here is no evidence that the appellee ever furnished any money to King-Porter Company, Inc., on any of its accounts receivable or any of the contracts that were pledged to the appellee as collateral security . . . There were no monies ever advanced in any of the undertakings nor were any claimed to have been advanced. . . ." EAC apparently sought to foster a theory that the chattel paper which is the subject of Counts I and II was accepted as collateral against the shipment by EAC of merchandise to the King-Porter companies, and that the debts would thus fall within the coverage of the second paragraph in the 1968 guaranty. However, this was not the theory of liability presented to the jury and is without support in the record.

agreement of September 16, 1965, signed by Mr. Porter alone extends only to "purchases and loans *secured by Speed Queen inventory . . . for any such goods* which may be purchased, shipped, or ordered at any time in the future." The emphasized terms clearly limit liability to the financing of Speed Queen products. Indeed, non-Speed Queen merchandise was not floor plan financed by EAC until 1968. In short, no provision of the 1965 guaranty covers this later extension of credit.

The final paragraph of the 1968 guaranty signed by Mr. and Mrs. Porter as already explained applies only to retail installment financing and that is not pertinent to Count III claims. The Porters' liability on this count must therefore arise from the printed provisions of the 1968 guaranty. This agreement contains the following printed provision which can be read to include the floor plan financing of non-Speed Queen merchandise: "I (we) do hereby guarantee to the said [EAC] the prompt payment of any and all indebtedness now due or hereafter to become due to the said [EAC] from the said *King Porter Co., et al*, for any goods which may be purchased, shipped, or ordered at any time in the future." If entitled to its fullest effect, this paragraph could extend liability far beyond the receivables financing described in the added final paragraph and even beyond the floor plan financing of the earlier guaranty.

Additionally, to the extent "King Porter Co." as used in the final paragraph might be interpreted to refer only to King-Porter Co., Inc., the extension of coverage to King Porter Co., *et al* almost surely expands the agreement to all four corporations. However, as previously noted, blanks provided in the guaranty for inserting the name of the debtor were apparently filled in *after* institution of this suit. Both Royce and Porter agreed that this document was prepared and signed with only the installment financing scheme in mind. Royce also stated that he did not know who filled in the blanks or who authorized it to be done. This vagueness is consistent with the fact that at no time did any witness suggest that the printed provisions of the 1968 guaranty were the source of any liability.

■■■■■ Ordinarily, the construction of written instruments is the responsibility of the court. Here the court, without objection, must have determined that the guaranty was ambiguous in its coverage because it left to the jury the task of attributing a meaning to the language. This sort of responsibility cannot be discharged without a basis in the evidence. EAC had the burden of showing that the parties contracted by some part of what they wrote to underwrite the McKee & McRae debt, yet the record discloses no testimony that would support a conclusion that the parties intended that such a debt be covered by the paragraph quoted above. EAC's failure to tie the debt it claimed in Count III to this or any other term of the 1968 agreement demands reversal of the verdict for EAC as to this count. The district court is directed to modify the judgment accordingly.

Costs of this appeal shall be evenly divided between the parties except for the cost of reproducing Exhibit P–7, the entire cost of which shall be assessed to appellee.

Affirmed in part, reversed in part and remanded with directions.