815 F.2d 702
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
DELTA MINERALS CORPORATION, Plaintiff-Appellee,
v.
FIRST MISSISSIPPI CORPORATION, Defendant-Appellant.
 No. 86-5391.
 United States Court of Appeals, Sixth Circuit.
 March 9, 1987.
 
 Before JONES and GUY, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This is a breach of contract action brought by Delta Minerals Corporation (Delta), a privately-held Tennessee corporation with its principal place of business in Memphis, Tennessee, against First Mississippi Corporation (FMC), a publicly held corporation with its principal place of business in Jackson, Mississippi. The case was filed in Shelby County, Tennessee, but was removed to federal court by FMC. Diversity jurisdiction pursuant to 28 U.S.C. Sec. 1332 has been established. Delta contended that FMC had breached: (i) a written licensing agreement which obligated FMC to pay to Delta a non-refundable advance license fee of $700,000.00 (only $200,000.00 of which had been paid); and (ii) an oral agreement which obligated FMC to pay fifty percent of the total attorneys' fees and expenses incurred in litigation related to the patented process Delta was licensing to FMC. The court found in favor of Delta, awarding the corporation $500,000.00 plus pre-judgment interest on the breach of contract claim and $14,118.85 on the claim for attorneys' fees, from which FMC takes this appeal. Finding no error in the judgment below, we affirm.
 
 I.
 
 2
 The president and principal stockholder of Delta, Mr. E.K. Wilson, Sr., is the inventor of the "Delta Process," a patented process for the manufacture of Portland and other hydraulic cements. Upon completion of development of the process, Wilson assigned the patent to Delta. Shortly thereafter, FMC entered into a joint venture with Delta for the purpose of commercializing and exploiting the Delta Process. Under this agreement, FMC was obligated to contribute $500,000.00 for additional pilot plant studies and to spend up to $9,500,000.00 to construct the first commercial plant utilizing the Delta Process. Approximately two years later, after conducting two pilot-plant feasibility programs, FMC concluded that a cement manufacturing plant could not be constructed for $9,500,000.00. Also during this period, Pennsylvania Engineering Corporation (PEC), at whose laboratory Delta had previously tested various aspects of the Delta Process, initiated litigation in which PEC disputed Delta's ownership of the process patents and also claimed misrepresentation by Delta and Wilson regarding the process. Delta retained counsel to defend this action and, in order to protect its interests in the Delta Process, FMC agreed to advance all attorneys' fees and expenses associated with this litigation. In return, Delta agreed to reimburse FMC for such fees out of the profits of the first plant constructed.
 
 
 3
 As a result of these developments, FMC insisted on renegotiating the original agreement. Although FMC believed that the prospects for successful commercialization of the Delta Process were good, they no longer wanted Delta as a partner in the venture. Negotiations ultimately resulted in the preparation and finalization of four separate but interrelated agreements: a Licensing Agreement; an Option to Purchase; a Stock Purchase Agreement; and a Consulting Agreement. Although certain provisions of the other agreements are relevant as interpretive aids, the focus of the parties' dispute is the language of the licensing agreement, which provides, in relevant part, as follows:
 
 
 4
 Section 3. Advance License Fees--FMC hereby agrees to pay DMC an advance license fee of Seven Hundred Thousand Dollars ($700,000) payable as follows: 1) The first advance license fee of Two Hundred Thousand Dollars ($200,000) payable upon execution of this Agreement, and 2) An additional advance license fee of Five Hundred Thousand Dollars payable upon the earlier of one year from the date of execution of this Agreement or the settlement and/or conclusion to FMC's satisfaction, the following actions: (a) that certain lawsuit entitled Pennsylvania Engineering Corporation, and Lectromelt Corporation vs. Delta Minerals Corporation and Eddie K. Wilson, Sr., Civil Action No. C-81-3052-M, currently pending before the United States District Court for the Western District of Tennessee, Western Division, (b) that certain patent Interference case currently before the United States Patent and Trademark Office entitled Howard F. Davis, Jr., et al, vs. Eddie K. Wilson, Sr., Interference No. 100,823, and (c) any other legal or administrative proceedings that may arise, result from, or relate to circumstances or facts set forth in (a) and (b) above.
 
 
 5
 ....
 
 
 6
 Such advance license fees will be non-refundable.
 
 
 7
 Upon execution of the agreements, Delta received a net payment of $500,000.00, which included $200,000.00 of the advance license fee.
 
 
 8
 Although this new agreement, executed in April of 1983, gave FMC the unfettered right to exploit the Delta Process, FMC elected not to proceed with further development of the technology. In January of 1984, FMC notified Delta that it was terminating the licensing agreement as provided for in part III, section 2 of the agreement. No licensing fees based upon cement clinker production nor fees from sub-licensing were ever generated as contemplated by the 1983 agreement. Upon demand, FMC refused to pay Delta the second installment of the advance license fee or its share of the attorneys' fees associated with the PEC litigation, whereupon Delta filed the instant action.
 
 II.
 
 9
 Delta's position before the district court was that the $500,000.00 advance license fee payment was owed by FMC regardless of its termination prior to the first anniversary date of the contract. FMC contended that its termination prior to the anniversary date relieved it of its obligation to make this payment. Alternatively, FMC claimed that, if the court should find that it was Delta's intent that the $500,000.00 fee be paid even if timely termination occurred, then there was no "meeting of the minds," and thus no contract as to this issue.
 
 
 10
 Following a two-day bench trial, the district judge issued oral findings of fact and conclusions of law. The court explained its rationale in upholding Delta's position:
 
 
 11
 The Court believes that the agreement can be interpreted by an examination of its plain language and that the plain language of the licensing agreement supports Delta Minerals' position with regard to this controversy. The language of the agreement initially refers to the two payments as a single fee of $700,000.00, although fee is later used in the plural to refer to the two payments. The agreement provides that the advance license fee is nonrefundable. There is no language in the agreement which relieves First Mississippi of its obligation to pay the $500,000.00 fee in the event of termination. Other portions of the agreement, particularly part III, section 2, do specify in detail the effect of termination on the obligations of the parties. In executing the licensing agreement and the option to purchase Delta Minerals relinquished and First Mississippi obtained complete control of the Delta Process for a two-year period. The $700,000.00 payment was guaranteed or up front compensation to Delta Minerals from First Mississippi for the exclusive privilege of developing the process. The payment served as compensation to Delta Minerals if First Mississippi failed to develop or commercialize the technology within the initial two-year licensing period.
 
 
 12
 The court also concluded that, even if the contract language was determined to be ambiguous, extrinsic evidence presented at trial supported Delta's contention that both parties agreed that Delta would receive a minimum payment of one million dollars within a year of the execution of the agreement.
 
 
 13
 With respect to the dispute regarding the proper allocation of attorneys' fees, the court ruled that the parties had orally agreed to modify their written agreement to render each liable for one-half of the fees resulting from the PEC and other related litigation. Finally, the court deemed an award of pre-judgment interest on the $500,000.00 amount appropriate due to its finding that FMC's refusal to pay this fee was contrary to the parties' clearly expressed intent as manifested in the contract.
 
 III.
 
 14
 On appeal, FMC contests only two issues: first, that the trial court erroneously concluded that the licensing agreement obligated it to pay the $500,000.00 sum to Delta despite its timely prior termination of the agreement; and second, that error was committed in the court's exclusion of certain written statements of Delta's counsel made in an unrelated matter, which were alleged to be contrary to Delta's asserted position at trial. Since FMC does not appeal the court's findings with respect to the attorneys' fees issue nor the award of pre-judgment interest, those issues will not be addressed.
 
 
 15
 The agreement between the parties in this case stipulates that the law of Mississippi shall govern its interpretation. Mississippi law provides that the determination of whether or not a contract is ambiguous is a question of law for the courts. EAC Credit Corp. v. King, 507 F.2d 1232, 1241 (5th Cir.1975); Freeman v. Continental Gin Co., 381 F.2d 459, 465 (5th Cir.1967). Since the interpretation of an unambiguous contract is a question of law, an appellate court reviews the contract provisions de novo, and not under the "clearly erroneous" standard. Cincinnati Gas & Electric Co. v. F.E.R.C., 724 F.2d 550, 554 (6th Cir.1984).
 
 
 16
 An ambiguous contract is one that is reasonably susceptible of more than one interpretation in light of surrounding circumstances and established rules of construction. Brander v. Nabors, 443 F.Supp. 764 (N.D.Miss.), aff'd, 579 F.2d 888 (5th Cir.1978). On the other hand, in cases involving otherwise unambiguous provisions, it has been consistently held that ambiguity is not created simply because the parties advance differing interpretations. Freeman, 381 F.2d at 465 (applying Mississippi law). In interpreting the contractual provisions at issue here, this court must look first solely to the language of the contract itself and give each term its plain and ordinary meaning. Mississippi Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 622 (5th Cir.1985); Pfisterer v. Noble, 320 So.2d 383, 384 (Miss.1975).
 
 
 17
 Looking solely at the contractual language, we find it to be both unambiguous and susceptible only to the interpretation arrived at by the district court. The fee is described in plain English as an "advance license fee of Seven Hundred Thousand ($700,000.00)." While only $200,000.00 of this amount was due and payable at closing, the only contingencies relative to payment of the balance were the earlier of either satisfactory conclusion of related litigation or the elapse of one year. FMC vigorously argues that such an interpretation renders "meaningless" certain provisions of the agreement's termination clause which triggers payments of increasing amounts of future royalties if the Delta Process were successfully commercialized by Delta after termination. Under this clause, if termination occurred prior to April 22, 1984, Delta was required to pay to FMC maximum royalties of two million dollars and, if termination occurred prior to April 22, 1985, the maximum royalty payment was three million, five hundred thousand, and so forth. FMC argues that it would be senseless for it to have voluntarily forfeited an extra one million, five hundred thousand dollars in royalties if it did not believe that termination within the first year relieved it of the obligation to pay the second installment of the advance license fee.
 
 
 18
 We agree with the district court which, in rejecting this argument, recognized that the royalty repayment provisions of the termination clause are related to FMC's planned commercialization of the Delta Process and are unrelated to the payment of the advance license fee. Rather, these increased royalty payments were intended to reimburse FMC for its increasing capital contributions which would have been necessitated by full commercialization of the process. We discern no inconsistency between the advance license fee agreement and the termination clause, since FMC "benefitted" from its early withdrawal by incurring fewer expenditures than it otherwise would have. Although FMC argues that its intent was to condition payment of the final installment of the advance license fee upon its decision not to exercise its termination rights within one year, that intent is nowhere expressed in the language of the agreement, and we find that Delta's conveyance to FMC of total control of the Delta Process for a period of two years was plainly adequate consideration to support FMC's counterpromise of a non-refundable advance license fee of $700,000.00.
 
 
 19
 In view of our conclusion that the contract was unambiguous on its face and capable of interpretation without the aid of extrinsic evidence, we do not reach the issue of the propriety of the district court's exclusion of Delta's counsel's written statements made in the context of settlement negotiations with third parties.
 
 
 20
 AFFIRMED.