RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0250P (6th Cir.)
File Name: 00a0250p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WALLACE HARDWARE
COMPANY, INC.,
       *Plaintiff-Appellant/*
       *Cross-Appellee,*

   *v.*

BILL ABRAMS,
       *Defendant-Appellee/*
       *Cross-Appellant,*

L.D. "LONNIE" ABRAMS,
       *Defendant-Appellee*
       *(98-5309)/*
       *Defendant (98-5594).*

Nos. 98-5309/5594

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 94-00254—Jennifer B. Coffman, District Judge.

Argued and Submitted: August 6, 1999

Decided and Filed: July 27, 2000

Before:  NELSON and MOORE, Circuit Judges; ROSEN,
District Judge.[*]

---

**COUNSEL**

**ARGUED:**   W. Thomas Bunch, BUNCH & BROCK, Lexington, Kentucky, for Appellant.  **ON BRIEF:**  W. Thomas Bunch, Matthew B. Bunch, BUNCH & BROCK, Lexington, Kentucky, Howard O. Mann, TRIMBLE & MANN, Corbin, Kentucky, for Appellant. Kenneth A. Smith, Jr., London, Kentucky, for Appellees.

---

**OPINION**

---

ROSEN, District Judge.

## I. *INTRODUCTION*

Plaintiff/Appellant Wallace Hardware Company, Inc. ("Wallace Hardware") appeals from various District Court rulings in favor of Defendant/Appellee/Cross-Appellant Bill Abrams and his brother, Defendant/Appellee L.D. ("Lonnie") Abrams.  Most significantly, Wallace Hardware contends that the District Court erred by refusing to enforce a Tennessee choice of law provision in a guaranty purportedly executed by the parties.   The lower court instead elected to apply Kentucky law, thereby rendering the guaranty invalid and unenforceable, and then awarded summary judgment in favor of the Abrams brothers on Wallace Hardware's breach-of-guaranty claim.  For his part, Defendant/Cross-Appellant Bill Abrams appeals the District Court's order permitting Wallace

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

Hardware to file an amended complaint asserting claims in addition to this breach-of-guaranty claim.[1]

In its amended complaint, Wallace Hardware augmented its breach-of-guaranty claim by asserting a breach-of-contract claim and two claims of fraud. The District Court ultimately entered summary judgment in favor of the Abrams brothers on two of these three claims,[2] and Wallace Hardware also challenges these rulings on appeal. Finally, in the event we reinstate one or more of its claims, Wallace Hardware argues that the District Court erroneously decided certain matters bearing upon the issue of damages.

For the reasons stated below, we hold that the parties are bound by their choice of Tennessee law in the guaranty agreement, and we therefore reverse the award of summary judgment to the Abrams brothers on the breach-of-guaranty claim. As to the remaining issues, we generally affirm the decision of the District Court, with the exception of certain rulings relating to damages.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. The Parties

Plaintiff/Appellant Wallace Hardware Company is a Tennessee corporation that provides wholesale hardware goods and services to retail hardware stores. In the summer of 1991, Wallace Hardware entered into an agreement to supply hardware inventory to Tri-County Home Center, Inc. ("Tri-County"), a newly opening hardware store located in Corbin, Kentucky. Tri-County was incorporated by Defendant/Appellee Lonnie Abrams, who served as Tri-County's president. Defendant/Appellee/Cross-Appellant Bill

---

[1] Co-Defendant Lonnie Abrams has not joined in this cross-appeal.

[2] The parties settled the remaining claim, one of Wallace Hardware's two claims of fraud.

Abrams provided financing for Tri-County, and assisted in operating the business.

## B.  The Tri-County Operating Agreement, Security Agreement, and Guaranty

In connection with Wallace Hardware's sale of hardware inventory to Tri-County, these two corporate entities executed a "New Account Application and Operating Agreement" dated August 9, 1991. Under this Agreement, Wallace Hardware extended a line of credit to enable Tri-County to purchase hardware goods and services. Both Lonnie and Bill Abrams signed the Agreement on behalf of Tri-County. Through their signatures, the Abrams brothers "agree[d] to be jointly, severally, and individually responsible for the payment of any and all goods and services furnished by Wallace Hardware Company, Inc. to our firm or to us individually." (J.A. at 52.)

To secure this line of credit, Tri-County executed an August 9, 1991 "Security Agreement," granting Wallace Hardware a security interest in "[a]ny and all inventory purchased by [Tri-County] from Wallace or otherwise [f]inanced by Wallace." (J.A. at 58.) Lonnie Abrams signed this security agreement on behalf of Tri-County as its president. The agreement's definitional section referred to Tennessee's enactment of the Uniform Commercial Code ("UCC") as the source for resolving any questions as to the meaning of terms. Finally, the security agreement provided that "the validity, interpretation, construction and enforcement of this Security Agreement, the obligations of [Tri-County] and the rights of Wallace hereunder, and any question which may arise concerning this Security Agreement or the transactions contemplated hereby, shall be governed in all respects by the law (including laws, statutes and case law) of the State of Tennessee." (J.A. at 59.)

In addition to this security agreement, Wallace Hardware also sought personal guaranties from both of the Abrams, in

Under these circumstances, we cannot say that Wallace Hardware's motion for leave to amend was brought so late in the proceedings that prejudice may be presumed. To the contrary, Bill Abrams had ample opportunity to address and defend against the additional allegations and claims in Wallace's amended complaint. Consequently, the court below did not abuse its discretion in granting leave to file an amended complaint.

## V.  *CONCLUSION*

For the foregoing reasons, we REVERSE the rulings of the court below on the breach-of-guaranty claim and the two issues of damages raised in Wallace Hardware's appeal, AFFIRM as to the remaining issues, and REMAND this matter to the District Court for further proceedings consistent with this decision.

bankruptcy estate to resolve the trustee's avoidable preference claim.

### E.    The District Court Did Not Err in Granting Leave for Wallace Hardware to File an Amended Complaint.

As his sole issue on appeal, Bill Abrams argues that the District Court erred in permitting Wallace Hardware to file an amended complaint. He notes that Wallace Hardware sought leave to amend some twenty-one months after filing its initial complaint, and contends that the additional claims and allegations contained in the amended complaint were in no way "newly discovered," but were or should have been known to Wallace Hardware from the outset of this litigation. Thus, Bill Abrams maintains that Wallace Hardware's amended complaint was the product of undue delay and caused him prejudice, and that the lower court therefore erred in granting leave to file this amended complaint.

We find no error in the lower court's determination. The decision whether to grant leave to amend is entrusted to the discretion of the District Court, and we will reverse only if the lower court abuses this discretion. *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041 (6th Cir. 1991). Delay, standing alone, is an insufficient basis for denying leave to amend, and this is true no matter how long the delay. *Moore v. City of Paducah*, 790 F.2d 557, 559-62 (6th Cir. 1986).

In this case, Bill Abrams' challenge rests almost exclusively on the length of Wallace Hardware's delay, along with the bare assertion that he suffered prejudice as a result of this delay. However, he has not identified any way in which he was actually prejudiced by Wallace's delay, and no prejudice is evident in the record before us. In particular, we note that the discovery period remained open when Wallace Hardware brought its motion for leave to amend on March 1, 1996, that the District Court's first substantive ruling was not issued until August 30, 1996, and that the lower court did not issue its final substantive ruling until December 23, 1997.

which they agreed to accept individual liability for Tri-County's indebtedness to Wallace Hardware. Accordingly, on August 21, 1991, Wallace Hardware tendered a "Guaranty Agreement" for signature by both Lonnie and Bill Abrams. Although both brothers' signatures appear on this Guaranty, Bill Abrams denies that he signed this document, and he has proffered the opinion of a handwriting expert that his purported signature is a forgery. For his part, Lonnie Abrams admits that he signed the Guaranty.

Under the terms of the Guaranty Agreement, the Abrams brothers "unconditionally guarantee[d] and promise[d] to pay to Wallace . . . any and all indebtedness" owed by Tri-County to Wallace Hardware. (J.A. at 61.) The guarantors' liability was "unlimited," "continuing," and encompassed "any indebtedness" incurred by Tri-County, including "that arising under successive transactions which shall either continue the indebtedness or from time to time renew it after it has been satisfied." (*Id.*) The obligations assumed by the guarantors were "independent" of Tri-County's obligations, and were not affected "by resort on the part of Wallace to any other security or remedy for the collection of said indebtedness." (*Id.*) Moreover, the guarantors "waive[d] any defense arising by reason of any disability or other defense of [Tri-County] or by reason of the cessation from any cause whatsoever of the liability of [Tri-County] for the indebtedness." (*Id.*) Finally, by its terms, the Guaranty Agreement was to be "governed by and construed in accordance with the laws of the State of Tennessee." (*Id.*)

### C.    Tri-County's Limited Operations Under Its Agreement with Wallace Hardware

Shortly after the above agreements were executed, Wallace Hardware began to ship merchandise to Tri-County's retail store in Corbin, Kentucky, and also assisted in setting up the store, displaying goods on the shelves, and establishing retail pricing for each item. The store opened in September of 1991, but soon began to lose money. On November 21, 1991,

a fire broke out at a warehouse at which Tri-County kept surplus inventory, resulting in almost $200,000 in property damage.[3]    In December of 1991, Tri-County ceased operations.  At the time, its outstanding balance under its account with Wallace Hardware stood at over $900,000.

**D.  Procedural Background**

Since Tri-County's hardware store closed in December of 1991, the parties have engaged in lengthy legal proceedings in three different forums.  First, on December 17, 1991, Tri-County brought a breach-of-contract suit against Wallace Hardware in Kentucky state court.  In turn, Wallace Hardware commenced a state court action against Tri-County just two days later, also alleging breach of contract.  The parties resolved these suits shortly thereafter, through a stipulated order of voluntary dismissal without prejudice entered by the Kentucky court on December 20, 1991.

Pursuant to this state court order, Wallace Hardware was authorized to repossess the inventory it had sold to Tri-County under the parties' Operating Agreement.  This order further provided that "Wallace shall thereby *immediately* allow to Tri-County a credit for all such inventory received at the prices at which it was invoiced by Wallace to Tri-County, and Tri-County shall, likewise, thereupon immediately receive satisfaction or partial satisfaction, as the case may be, of any debt or claim which may hereafter be determined to exist by Tri-County to and in favor of Wallace." (J.A. at 415 (emphasis in original).)  By its terms, the order did not

---

[3] A Kentucky State Police arson investigator determined that the fire was deliberately set.  In Tri-County's subsequent bankruptcy proceedings, the Bankruptcy Court noted that Lonnie Abrams had been indicted on charges of complicity to commit arson and false reporting of a burglary, and that his uncle, Denver Mayes, had been indicted on a charge of second degree arson.  (J.A. at 276.)  The Bankruptcy Court then found that the insurer of the warehouse had "established arson as a defense to liability under the subject insurance contract." (J.A. at 282.)

In holding to the contrary, the District Court reasoned in part that Wallace Hardware would not have been vulnerable to a preferential transfer challenge if it had properly perfected its security interest in the first instance by filing a UCC-1 form in the appropriate county. (12/22/97 Op. at 4-5, J.A. at 574-75.)  We believe that such notions of "fault" are misplaced in the present context, where the sole relevant question is whether the settlement agreement executed by Wallace Hardware and Tri-County should be treated as binding in spite of Tri-County's subsequent bankruptcy. This question turns purely on contract and bankruptcy principles, and not on the relative blameworthiness of the parties. In this regard, we observe that Wallace Hardware was permitted, under the terms of the Guaranty, to proceed directly against the guarantors without making any effort to collect from Tri-County.  Likewise, under the Guaranty, Wallace could have opted not to file a claim in the bankruptcy proceedings — or, alternatively, could have compromised this claim — without in any way impairing its right to recover any outstanding indebtedness from the Abrams brothers.  Given all this, the Abrams are in no position to complain if Wallace Hardware's collection efforts against Tri-County ultimately proved less than completely successful, where any success at all accrued to the Abrams' benefit.

In any event, we note that the "blame" is not so easily placed here.  Wallace Hardware quite legitimately sought to collect on a debt by repossessing Tri-County's inventory — a course of action, we note, that Tri-County expressly agreed to in its state court settlement with Wallace.  This effort would have succeeded if Tri-County — a corporation owned and operated by the Abrams brothers — had not been placed into bankruptcy.  Surely, Wallace Hardware cannot be blamed for this turn of events, which it presumably had no reason to anticipate at the time it secured Tri-County's agreement to repossess the inventory.  Therefore, in keeping with the great weight of authority, we hold that Wallace Hardware may seek to recover the $128,000 payment it made to Tri-County's

of accord and satisfaction, to give Tri-County full dollar-for-dollar credit for the value of the repossessed inventory, even though Wallace subsequently disgorged a portion of this recovery to Tri-County's bankruptcy estate. We do not see why this is so. As we explained in *International Union, United Auto., Aerospace, and Agric. Implement Workers of America v. Yard-Man, Inc.*, 716 F.2d 1476, 1487 (6th Cir. 1983), an accord and satisfaction operates under traditional contract principles. Thus, an accord and satisfaction, like any contract, can be set aside, in whole or in part, for such reasons as mutual mistake, supervening illegality, or frustration of purpose. *See* Restatement (Second) of Contracts §§ 152, 264, 265.

Moreover, the outcome here would seem to be dictated by the very nature of an "avoidable" preferential transfer under § 547 of the Bankruptcy Code. Not surprisingly, the courts have uniformly held that a payment of a debt that is later set aside as an avoidable preference does not discharge a guarantor of his obligation to repay that debt. *See Lowrey v. Manufacturers Hanover Leasing Corp. (In re Robinson Bros. Drilling, Inc.)*, 6 F.3d 701, 704 (10th Cir. 1993); *Crocker v. Third Nat'l Bank (In re Quality Takes Time, Inc.)*, 96 B.R. 818, 819-20 (Bankr. M.D. Tenn. 1989); *Schwarz v. Equitable Bank, N.A. (In re Express Liquors, Inc.)*, 65 B.R. 952, 962 (Bankr. D. Md. 1986); *Neill v. Borreson (In re John Peterson Motors, Inc.)*, 56 B.R. 588, 596 & n.10 (Bankr. D. Minn. 1986); *Herman Cantor Corp. v. Central Fidelity Bank, N.A. (In re Herman Cantor Corp.)*, 15 B.R. 747, 750 (Bankr. E.D. Va. 1981). This is precisely what occurred here: Wallace Hardware sought repayment of Tri-County's debt through repossession of inventory, but then was forced to return a portion of this repayment to settle the bankruptcy trustee's claim of an avoidable preference. It follows that the Abrams brothers, as guarantors, remain liable for the portion of Tri-County's debt that remains outstanding in light of Wallace Hardware's partial return of the proceeds of its inventory repossession.

"[a]ffect either part[y's] right to assert any claims for damages or otherwise not specifically addressed herein," and neither party was deemed to have "waive[d] any of its rights or causes of action in any manner whatsoever against the other as a result of Tri-County's willingness to release inventory and as a result of Wallace's desire to receive and retain the inventory." (J.A. at 416.)

Before Wallace Hardware could commence repossession of the inventory, however, it first had to correct an earlier mistake in its effort to perfect its security interest in this inventory. When Wallace Hardware and Tri-County executed the Operating Agreement in August of 1991, Lonnie Abrams signed a UCC-1 form on behalf of Tri-County, confirming Wallace Hardware's security interest in the inventory to be supplied under the Operating Agreement. Wallace Hardware then filed this UCC-1 form in Whitley County, Kentucky on August 15, 1991. Because Tri-County's store was located in Laurel County, this initial filing was ineffective to perfect Wallace Hardware's security interest. Accordingly, Wallace Hardware re-filed the UCC-1 in Laurel County on December 19, 1991, thereby perfecting its security interest. On December 23 and 24, 1991, Wallace Hardware repossessed Tri-County's inventory, and gave Tri-County a credit in the amount of $784,269, leaving a balance of $145,546.[4]

Just under 90 days later, on March 13, 1992, Tri-County's unsecured creditors commenced an involuntary Chapter 7 proceeding in the U.S. Bankruptcy Court for the Eastern District of Kentucky. On June 25, 1992, Tri-County itself brought a voluntary Chapter 7 proceeding in the Bankruptcy Court. As part of these proceedings, the bankruptcy trustee sought to restore to the estate the inventory repossessed by

---

[4] In the current suit, Wallace Hardware alleges that the outstanding balance at the time actually was $455,410 — the account balance of $145,546, plus a "restocking fee" of $156,853, plus out-of-pocket expenses of $153,010 incurred in repossessing the inventory.

Wallace Hardware, under the theory that this repossession was an avoidable preferential transfer to a creditor within 90 days before the date the involuntary bankruptcy petition was filed.[5]

The trustee and Wallace Hardware ultimately resolved this matter, through an agreement approved by the Bankruptcy Court on December 8, 1993. Because the inventory repossessed from Tri-County had been commingled with other goods and resold, Wallace Hardware was not required under the settlement agreement to return this inventory to the bankruptcy estate. Instead, Wallace Hardware paid $128,000 to the trustee, "in full and complete settlement, accord and satisfaction of any and all claims the Trustee has, had or may have against Wallace," and the trustee's claims against Wallace Hardware were dismissed with prejudice. (J.A. at 310.) Under the settlement agreement, Wallace Hardware preserved its claim against the bankruptcy estate as an unsecured creditor, with the exception that it agreed not to seek "distribution from the Trustee of any share, dividend or payment based upon or relating to the [$128,000] Settlement Sum." (J.A. at 311-12.)[6]

Wallace Hardware then brought the present suit against Lonnie and Bill Abrams in the U.S. District Court for the Eastern District of Kentucky. In its initial complaint, filed on July 12, 1994, Wallace Hardware asserted a single breach-of-

---

[5] As discussed below, if Wallace Hardware had properly perfected its security interest in its initial UCC-1 filing on August 15, 1991, it would not have been subject to this preference attack by the bankruptcy trustee, as it would not have improved its position during the 90 days prior to the bankruptcy proceeding.

[6] The record does not disclose the final outcome of the bankruptcy proceedings, nor whether Wallace Hardware ever received any distributions from the bankruptcy estate that might have further reduced Tri-County's remaining indebtedness (and, hence, the potential liability of the Abrams brothers as purported guarantors of that indebtedness).

by the principal debtor. Although this task can be complicated where, as here, there are such intervening developments as bankruptcy, settlements, and the like, the basic task remains the same: to sum up the principal debtor's obligations to the creditor, and then subtract each partial satisfaction of this indebtedness, whether through repayment, repossession, the creditor's failure to fully perform, or any other means. The result is the outstanding indebtedness of the principal debtor which, assuming the guaranty is enforceable and its conditions are satisfied, may be collected from the guarantor.

Viewed in this context, it is clear that Wallace Hardware's $128,000 payment to Tri-County's bankruptcy estate is recoverable from the Abrams brothers as guarantors — assuming, of course, the Guaranty is otherwise enforceable against the Abrams, a question we do not decide. When Tri-County defaulted on its indebtedness, Wallace Hardware attempted to satisfy the deficiency — and, in fact, succeeded in substantial part — by repossessing the inventory it previously had supplied to Tri-County. However, as a result of Tri-County's subsequent bankruptcy, Wallace Hardware was unable to retain the full value of the repossessed inventory. Instead, the bankruptcy trustee sought the return of all of the repossessed inventory, and the matter ultimately was settled through Wallace's $128,000 payment into Tri-County's bankruptcy estate. In effect, then, Wallace Hardware's repossession effort reduced Tri-County's indebtedness by the dollar-for-dollar value of the repossessed inventory, less the $128,000 Wallace refunded to the bankruptcy estate. After this amount — the value of the repossessed inventory minus $128,000 — is subtracted from Tri-County's initial indebtedness, Wallace Hardware may seek to recover any remaining indebtedness from the Abrams as guarantors.

In arguing that Wallace Hardware may not seek to recover its $128,000 payment, Bill Abrams asserts, and the District Court held, that Wallace Hardware is bound, under principles

**D. Wallace Hardware May Seek to Recover the $128,000 Settlement Sum Paid to Tri-County's Bankruptcy Trustee, and Also May Present Proofs as to Whether Tri-County's Outstanding Indebtedness Includes a 20-Percent Restocking Fee.**

Wallace Hardware has raised two final issues on appeal, both bearing upon the damages it may seek to recover from the Abrams brothers. First, Wallace Hardware challenges the District Court's statement, in its December 22, 1997 Opinion, that Wallace cannot recover a 20-percent "restocking fee" absent proof that it provided Tri-County with a copy of an "internal policy statement" setting forth the obligation to pay this fee. (12/22/97 Op. at 2, J.A. at 572.) This statement, we note, was essentially dicta, as the Court went on to hold (i) that Wallace Hardware could recover this fee if it were shown to be standard in the industry, but (ii) that the existing record did not establish this fact as a matter of law. Thus, the District Court did not in any way rule out Wallace Hardware's recovery of the restocking fee. In any event, we agree with Wallace Hardware that this UCC-based "industry standard" inquiry does not turn solely on whether Tri-County was or was not given a copy of Wallace Hardware's "internal policy statement" addressing this fee; there are other permissible means of proving that the 20-percent fee is routinely charged in the relevant industry. To the extent the District Court suggested otherwise, we reverse its decision.

Next, Wallace Hardware argues that it is entitled to seek reimbursement of the $128,000 it paid into Tri-County's bankruptcy estate as part of its settlement with the bankruptcy trustee. We agree, for many of the same reasons set forth above in our ruling that the Abrams brothers may defensively assert Tri-County's breach-of-contract claims. As discussed earlier, and as we held in *Coffey, supra*, 992 F.2d at 1449-50, a guarantor's liability is commensurate with the outstanding indebtedness of the principal debtor. Consequently, the principal goal in an action to collect on a guaranty, such as we have here, is to ascertain the outstanding indebtedness owed

guaranty claim, alleging that the Abrams brothers were liable for the indebtedness then owed by Tri-County to Wallace — in the amount of $720,106.38, according to the complaint — minus any disbursements subsequently received by Wallace from Tri-County's bankruptcy estate.

Nearly two years later, on March 1, 1996, Wallace Hardware filed a motion seeking leave to file an amended complaint. In this proposed pleading, Wallace Hardware sought to supplement its breach-of-guaranty claim with (1) a breach-of-contract claim, based on the August 9, 1991 Operating Agreement signed by both Lonnie and Bill Abrams; (2) a claim of negligent and/or intentional misrepresentation, arising from the Abrams' alleged assurances as to their credit history, solvency, and experience that induced Wallace Hardware to extend credit to Tri-County; and (3) a fraud claim, relating to the Abrams' alleged false statements as to the structure and operation of Tri-County, their alleged conversion and destruction of goods obtained by Tri-County, and their failure to list Wallace Hardware as a beneficiary on fire insurance policies. Also on March 1, 1996, the Abrams brothers filed a motion seeking the application of Kentucky law to the breach-of-guaranty claim, and a motion seeking summary judgment in their favor on this claim.

In a Memorandum Opinion and Order issued on August 23, 1996, U.S. District Judge Jennifer B. Coffman granted each of these motions in substantial part. Wallace Hardware was permitted to file an amended complaint, with the exception of the proposed claim of negligent misrepresentation, which the District Court held was not a recognized theory of recovery under Kentucky law. Next, the lower court ruled that Kentucky law should govern the breach-of-guaranty claim, notwithstanding the Tennessee choice-of-law provision in the Guaranty itself. Upon surveying Kentucky choice-of-law rules, and concluding that they call for the application of Kentucky law whenever that state's interests predominate over all others, the District Court found that "Kentucky

clearly has the greater interest in the present case." (J.A. at 197.)  Finally, given its choice of Kentucky law, the Court readily concluded that the Guaranty was invalid and unenforceable, as Wallace Hardware conceded that the Guaranty failed to comport with the requirements imposed by a Kentucky statute governing the form of guaranties, Ky. Rev. Stat. Ann. § 371.065(1).

Next, on May 6, 1997, Bill Abrams filed a motion seeking leave to amend his answer to assert that Wallace Hardware's alleged breach of its contract with Tri-County served to defeat its effort to collect from the Abrams brothers, as guarantors, any amounts allegedly owed under that contract.  As noted in this motion, Lonnie Abrams previously had asserted this same defense in his answer to the initial complaint.  On May 21, 1997, Wallace Hardware filed a response in opposition to Bill Abrams' motion, as well as a separate motion asking that this defense be stricken from Lonnie Abrams' answer.  The next day, Wallace Hardware filed a motion requesting that the District Court reconsider its earlier choice-of-law ruling in light of a recent decision by the Kentucky Supreme Court in *Prezocki v. Bullock Garages, Inc.*, 938 S.W.2d 888 (Ky. 1997).  Finally, in late August and early September of 1997, the parties filed cross-motions for summary judgment on various counts of the first amended complaint.

On December 19, 1997, the District Court issued a Memorandum Opinion and Order addressing the issues in these various motions.  First, the Court permitted Bill Abrams to amend his answer, and declined to strike any defenses from Lonnie Abrams' answer.  Next, the lower court found no basis, in the *Prezocki* decision or otherwise, for reversing its earlier ruling applying Kentucky law to the breach-of-guaranty claim.  The Court then awarded summary judgment to the Abrams brothers on Wallace Hardware's breach-of-contract claim, finding that the Operating Agreement suffered from the same defects under Kentucky law as did the Guaranty.  Finally, the District Court found that one of Wallace Hardware's two claims of fraud was subject to

on a forgone claim, but at least two courts have suggested a way to make this determination.  *See Central Soya Co.*, 676 F.2d at 941-44; *In re El Paso Refining, Inc.*, 192 B.R. 144, 148-49 (Bankr. W.D. Tex. 1996).  If necessary, the District Court should consult these decisions on remand.

**C.  The District Court Properly Dismissed Count IV of the Amended Complaint as Failing to Allege the Necessary Elements of a Claim of Fraud or Misrepresentation.**

As its next issue on appeal, Wallace Hardware contends that the District Court erred in dismissing Count IV of its amended complaint for failure to allege all of the necessary elements of a claim of fraud or misrepresentation.  We affirm the lower court's dismissal of this count.

As observed by the court below, a claim of fraud or misrepresentation cannot succeed absent proof that the plaintiff acted in reliance on the purported misrepresentations.  *See Coffey*, *supra*, 992 F.2d at 1447 n.7.  Where the alleged misstatements relate to future events, the plaintiff may establish this necessary element of reliance by showing that the statements induced him to enter into a contractual relationship.  *See Coffey*, 992 F.2d at 1447-48.  The District Court found that Wallace Hardware had failed to allege either reliance or inducement in support of Count IV of its amended complaint.

Upon independent *de novo* review of the amended complaint, we agree that it contains no such allegations.  Indeed, even on appeal, Wallace Hardware still has not identified any actions it allegedly took in reliance on the Abrams' purported misrepresentations.  Thus, the District Court properly dismissed Count IV of the amended complaint.

the record before us, that the value of Tri-County's breach-of-contract claims was somehow accounted for in the trustee's settlement with Wallace Hardware. If so, the Abrams' assertion of these same claims in this action presents the risk of a "double set-off" against Tri-County's overall indebtedness to Wallace Hardware because, under these circumstances, the bankruptcy settlement presumably has already produced a reduction in Tri-County's indebtedness in exchange for the relinquishment of Tri-County's claims.[22] We would then be confronted with a situation more like the one presented in *In re Van Dresser Corp.*, and the Abrams brothers would not be permitted to reassert Tri-County's breach-of-contract claims in this case, even if only defensively.

Even so, this would not be the end of the matter. Instead, it would then be necessary to determine the value of Tri-County's breach-of-contract claims as reflected in the bankruptcy settlement. Absent this determination, there would be no "double set-off" here, because the Abrams brothers would not be given the benefit of the initial set-off that presumably was obtained by the bankruptcy trustee in exchange for the agreement to dismiss Tri-County's claims. The Abrams clearly are entitled to this credit against the amount owed under the Guaranty, since any reduction in Tri-County's indebtedness, whether through a cash payment or any other means, also serves to reduce the Abrams' liability under the Guaranty — and this is so even where the reduction is achieved through an agreement to release a claim. *See Central Soya Co. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 942 (7th Cir. 1982). Admittedly, it is no easy task to place a value

---

[22]We note, again, that there is no evidence in the settlement document itself that the parties viewed the breach-of-contract claims as part of the bargain, or that they assigned any value to the trustee's agreement not to pursue these claims. Perhaps this reflects the parties' assessment of the *de minimis* value of these claims, or perhaps the parties simply failed to account for these claims in reaching their settlement; we cannot say under the present record.

dismissal as lacking the necessary allegations of inducement or reliance, but that issues of fact precluded an award of summary judgment to either side on the remaining fraud claim.

In a subsequent Memorandum Opinion and Order issued on December 22, 1997, the District Court addressed two outstanding issues of damages. First, the Court found that issues of fact remained as to whether Wallace Hardware could collect the 20-percent restocking fee included as an element of its claimed damages. Next, the Court ruled that the doctrine of accord and satisfaction precluded Wallace Hardware from recovering the $128,000 settlement amount it paid to the bankruptcy trustee following its December, 1991 repossession of Tri-County's inventory.

In light of these rulings, only one claim of fraud remained to be resolved. The parties settled this claim and, on February 23, 1998, stipulated orders were entered reflecting the final disposition of all proceedings in the lower court. These appeals followed.

### III.  *THE PARTIES' ARGUMENTS ON APPEAL*

In its appeal, Wallace Hardware has identified four purported defects in the District Court's rulings. First and foremost, Wallace Hardware contends that the court below erred by invalidating the Tennessee choice-of-law provision in the Guaranty, and instead electing to apply Kentucky law to determine the parties' obligations under that document. As a result of this choice-of-law determination, the Court concluded that the Guaranty was unenforceable, and it awarded summary judgment to the Abrams brothers on the breach-of-guaranty claim.

Next, Wallace Hardware challenges the District Court's decision to permit Bill Abrams to amend his answer to assert the so-called "corporate defenses" of Tri-County, as well as the decision not to strike similar defenses asserted in the answer filed by Lonnie Abrams. Third, Wallace Hardware

argues that the District Court erred in dismissing one of its fraud claims for failure to allege all of the requisite elements in support of that claim. Finally, Wallace Hardware contends that the court below erred in ruling that the recoverability of the 20-percent "restocking fee" turned upon whether Tri-County or the Abrams brothers were provided with a copy of Wallace Hardware's internal policy calling for the imposition of this fee.

In his cross-appeal, Bill Abrams has raised one additional issue. Specifically, he asserts that the District Court erred in permitting Wallace Hardware to amend its complaint over a year and a half after the initial complaint was filed. Abrams contends that this was undue delay, and that he was prejudiced by the lower court's ruling.

## IV. *ANALYSIS*

### A. The Guaranty's Choice-of Law Provision Is Enforceable.

Although additional theories of liability are asserted in the amended complaint, it is clear that Wallace Hardware's chief basis for recovery in this case rests upon the August 21, 1991 Guaranty Agreement, in which the Abrams brothers purportedly agreed to repay the indebtedness owed by Tri-County to Wallace Hardware. By its express terms, this Guaranty provides that it is to be "governed by and construed in accordance with the laws of the State of Tennessee." (J.A. at 61.) The District Court, however, concluded that Kentucky courts would not honor this choice-of-law provision, where the parties and the underlying transaction bore a stronger relationship to Kentucky than to Tennessee. Wallace Hardware argues that the Guaranty's choice-of-law provision should be enforced, and that Tennessee law should govern its breach-of-guaranty claim. For the reasons discussed below, we agree.

claims against Tri-County without relinquishing its right to recover any remaining indebtedness from the Abrams brothers as guarantors. Further, under bankruptcy law, as well as the terms of the Guaranty, Tri-County's indebtedness to Wallace Hardware could have been completely discharged without affecting the liability of the guarantors. Under these circumstances, we believe it would be inequitable to permit Wallace Hardware and the bankruptcy trustee to resolve any claims as between Wallace and Tri-County — which settlement would fully preserve Wallace's claims against the guarantors — and, at the same time, irrevocably fix the amount of Tri-County's indebtedness to Wallace Hardware, thereby foreclosing any opportunity for the Abrams brothers to challenge the factual basis for this determination. *Cf. Rhode Island Bank*, *supra*, 789 F.2d at 80-81 (citing "principles of equity" in holding that a guarantor was permitted to assert a defense of the principal debtor, where the defense in question was based upon the creditor's failure to perform).

Such a result would produce an undue windfall for Wallace Hardware, as it would allow its single settlement with the bankruptcy trustee to bind the parties to two separate and independent contractual relationships. Wallace Hardware has already obtained the "benefit of the bargain" under the settlement — in exchange for its payment of $128,000 into the bankruptcy estate, it was given the right to retain the inventory it had repossessed, plus the trustee's promise not to contest the outstanding balance of its claim against the bankruptcy estate, whether through pursuit of a breach-of-contract claim or otherwise. In our judgment, Wallace Hardware is not also entitled, through this same settlement, to preclude the Abrams brothers from asserting a breach-of-contract defense to achieve a set-off against the remaining amount of Tri-County's indebtedness.

Before leaving this issue, we wish to raise one final point for the District Court's consideration on remand. As we suggested earlier, it is possible, though not demonstrated in

not mentioned in the paragraph of the agreement setting forth the basis for the settlement amount paid by Wallace Hardware. (*See* Agreed Order of Settlement at ¶ 14, J.A. at 313.) From all that appears in the document itself, the parties mainly were concerned with resolving the trustee's claim that Wallace Hardware's repossession of Tri-County's inventory constituted an avoidable preferential transfer.

This lack of specificity, of course, would provide no defense if Tri-County or the trustee subsequently sought to assert a breach-of-contract claim against Wallace Hardware. As parties to the settlement, they would be bound by the broad scope of the release to which they agreed. With respect to the Abrams as guarantors, however, the inquiry is somewhat different. They were not parties to the settlement and, as the District Court recognized, the trustee's interests were not sufficiently aligned with theirs to treat them as bound by the trustee's agreement. *See Becherer*, *supra*, 43 F.3d at1069-70.[21] In particular, the trustee did not share the Abrams' direct, personal, and considerable financial incentive to prove that Wallace Hardware breached its contractual obligations to Tri-County. Given this lack of a personal stake in the outcome, the trustee presumably gave more weight to such considerations as the expense of further litigation and the desirability of a speedy resolution to the dispute, and less weight to the potential value of Tri-County's breach-of-contract claims against Wallace Hardware.

More importantly, to allow the guarantors to be bound by the trustee's settlement on behalf of the principal debtor, Tri-County, would ignore the independent nature of the separate creditor/debtor and creditor/guarantor agreements, and instead convert this "independence" into a one-way street favoring the creditor. As noted earlier, under the terms of the Guaranty, Wallace Hardware was free to compromise its

---

[21]And, of course, there can be no claim of issue preclusion here, where Tri-County's breach-of-contract claims against Wallace Hardware have never been actually litigated.

### 1.    Section 187 of the Restatement (Second) of Conflict of Laws Governs the Enforceability of the Guaranty's Choice-of-Law Provision.

This case was brought under the District Court's diversity jurisdiction. Consequently, as the lower court correctly observed, the choice-of-law rules of the forum state, Kentucky, govern the determination whether to enforce the Guaranty's selection of Tennessee law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020 (1941); *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993). The District Court resolved this issue as a matter of law, and we review this ruling *de novo*. *See MacDonald v. General Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997).

In electing not to give effect to the Guaranty's choice-of-law provision, and to instead apply Kentucky law, the District Court began its analysis with the observation that "Kentucky courts are egocentric concerning choice of law questions." (8/23/96 Op. at 4, J.A. at 196 (citing *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. Ct. App. 1987)).) On at least two occasions, we likewise have noted this provincial tendency in Kentucky choice-of-law rules. *See Adam v. J.B. Hunt Transp., Inc.*, 130 F.3d 219, 230-31 (6th Cir. 1997); *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983). Indeed, in *Harris Corp.*, we construed a then-recent Kentucky Supreme Court decision as indicating that "Kentucky law will apply to a contract issue if there are sufficient contacts and no overwhelming interests to the contrary, even if the parties have voluntarily agreed to apply the law of a different state." *Harris Corp.*, 712 F.2d at 1071 (citing *Breeding v. Massachusetts Indem. and Life Ins. Co.*, 633 S.W.2d 717 (Ky. 1982)).

With this starting premise, the District Court turned specifically to the 1982 decision in *Breeding*, *supra*, which still stands as the most recent occasion on which Kentucky's highest court addressed a contractual choice-of-law

provision.[7]  In that case, the plaintiff administratrix of the estate of Danny Breeding sought to collect under an accidental death policy taken out by Mr. Breeding, a Kentucky resident, when he rented a car from a Budget Rent-A-Car agency in Louisville.  Mr. Breeding died while this insurance policy was in effect, and was legally intoxicated at the time of his death.  The defendant insurer contended that the plaintiff's claim was excluded under policy language denying coverage for losses caused directly or indirectly by intoxicants.  In response, the plaintiff argued that this exclusion was unenforceable, due to the insurer's failure to comply with a provision in Kentucky's insurance code requiring that policyholders be provided with a certificate of insurance setting forth the terms of coverage, as well as a provision in the policy itself calling for similar disclosures.  Because Mr. Breeding had not been given such a certificate of insurance, the plaintiff argued that the defendant insurer could not escape liability by appealing to a policy exclusion that was never disclosed to the insured.

In *Breeding*, the policy at issue included a choice-of-law clause providing that its terms were governed by "the laws of the state of delivery of the policy," 633 S.W.2d at 719, and the master policy was delivered to Budget at its corporate offices in Delaware.  Under Delaware law, in contrast to Kentucky law, the insurer was not required to furnish a certificate of insurance to each policyholder.  Thus, in order to determine whether any policy exclusions applied, the Kentucky Supreme Court first had to decide whether the case before it was governed by Kentucky or Delaware law.

---

[7]Both in the lower court and on appeal, Wallace Hardware has pointed to the Kentucky Supreme Court's more recent ruling in *Prezocki v. Bullock Garages, Inc.*, 938 S.W.2d 888 (Ky. 1997), which featured a contractual clause that contained both choice-of-law and choice-of-forum language.  Yet, as Wallace Hardware concedes, *Prezocki* addressed only the forum selection portion of this clause, and thus bears only indirectly on the issue now before us.

of some of its debt, was bound by the bankruptcy trustees' settlement of the corporation's claims against Comerica Bank, and could not pursue separate claims on his own behalf. Next, in *Fr. Winkler KG v. Stoller*, 839 F.2d 1002, 1004, 1008 (3d Cir. 1988), the Third Circuit found that a guarantor, Gene Stoller, was precluded from raising the breach-of-contract defenses of the principal debtor, BEW, where Stoller himself had executed a release of these claims on behalf of BEW during the course of BEW's bankruptcy proceedings, in exchange for the creditor's agreement to withdraw its objections to BEW's plan of reorganization.  Finally, in *Roulier*, *supra*, 750 F. Supp. at 1062-63, the Court held that a guarantor could not assert the contractual defenses of the principal debtor, where the bankruptcy trustee for the debtor had sold to the creditor at public auction "all of the debtor's claims and causes of action," including the breach-of-contract claim sought to be asserted by the guarantor.

Upon careful reflection, however, we do not believe the same result is warranted here, at least on the record before us. As an initial matter, in each of the above-cited cases, the settlement executed during the bankruptcy proceedings *expressly released* the claim that the guarantor subsequently sought to assert.  Indeed, in one case, *Roulier*, the cause of action was actually sold at auction.  In this case, by contrast, the bankruptcy settlement between Wallace Hardware and Tri-County's trustee did not specifically refer to Tri-County's breach-of-contract claim, but instead generally resolved "any and all claims the Trustee has, had or may have against Wallace," and resulted in the dismissal of "all of the Trustee's claims in his Complaint against Wallace." (Agreed Order of Settlement at ¶¶ 1-2, J.A. at 310.)  Significantly, we have not been provided with a copy of the trustee's complaint against Wallace Hardware.  Nor is there any solid evidence, in the settlement agreement itself or elsewhere in the record, that the trustee — or Wallace Hardware, for that matter — had Tri-County's breach-of-contract claims in mind as among the claims that were being extinguished by operation of the bankruptcy court settlement.  These claims, for example, are

MOT had asserted counterclaims and affirmative defenses challenging its contractual obligation to pay the Coffeys, and Moore likewise had asserted affirmative defenses claiming an "entitlement to any and all rights, claims, and defenses available to MOT." 992 F.2d at 1442. We ruled that MOT's defenses had to be adjudicated before judgment could be entered against Moore as guarantor:

> .... [Moore] is correct in his general assertion that his obligation on the guaranty cannot be determined until MOT's obligation on the underlying contract is determined. It is clear that the "liability of a surety is . . . commensurate with that of his principal . . . ." Thus, if the counterclaims and affirmative defenses asserted by MOT against the Coffeys are adjudged meritorious, such that MOT is relieved of its contractual obligations, then Moore will also either be released from his guaranty obligation or, alternatively, entitled to the benefit of the set-offs received by MOT. The Coffeys concede that MOT's set-off claims have not yet been decided.

992 F.2d at 1449 (citation omitted). We further observed that the determination of these set-offs "can be made in this action," on remand to the district court. 992 F.2d at 1450.

Thus, there is ample authority for allowing a guarantor to assert the contractual defenses of the principal debtor, as the Abrams brothers seek to do here. Nevertheless, under the circumstances of this case, the Abrams must overcome one additional hurdle. Specifically, Wallace Hardware contends that the bankruptcy trustee released Tri-County's breach-of-contract claims, and that this release operates to bar the Abrams brothers from asserting these same contractual theories defensively in the present action.

At first glance, some case law appears to support Wallace Hardware's argument. First, in *In re Van Dresser Corp.*, *supra*, 128 F.3d at 947-49, we held that Honigman, a creditor and shareholder of the bankrupt corporation and the guarantor

The Court ruled that the insurance policy in question was controlled by Kentucky law, and that the defendant insurer was estopped from asserting the policy exclusion for losses attributable to intoxicants. In so holding, the Court first observed that it had previously abrogated the rigid *lex loci contractus* approach to determining the governing law in a contract dispute, and had instead adopted the "most significant relationship" test set forth at § 188 of the Restatement (Second) of Conflict of Laws. 633 S.W.2d at 719 (citing *Lewis v. American Family Ins. Group*, 555 S.W.2d 579, 581-82 (Ky. 1977)).[8] The Court then applied this § 188 test, comparing the respective interests of Kentucky and Delaware under the facts of the case before it:

> It is patently obvious that Kentucky has the greater interest in and the most significant relationship to this transaction and the parties. The insurance was purchased in Kentucky by a Kentucky resident from a Kentucky corporation [*i.e.,* the local Budget rental car franchise]. The claim was initiated by a Kentucky resident, and the claim arose from an accidental death in Kentucky.

---

[8] Section 188 provides, in relevant part:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties . . . .

> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account . . . to determine the law applicable to an issue include:
>   (a) the place of contracting,
>   (b) the place of negotiation of the contract,
>   (c) the place of performance,
>   (d) the location of the subject matter of the contract, and
>   (e) the domicile, residence, nationality, place of incorporation and place of business of the parties . . . .

Restatement (Second) of Conflict of Laws § 188.

On the other hand, Delaware has no significant relationship to the transaction and the parties. The [insurer] merely delivered the master insurance policy to the Delaware corporate office of Budget Rent-A-Car of America, a nationwide corporation having franchises among the fifty states. This one act of delivery, the only contact involving Delaware, does not establish a significant relationship, but merely one that is tenuous at best.

633 S.W.2d at 719.

Notably, the *Breeding* Court did not apply, nor even mention, § 187 of the Restatement, which specifically addresses contractual choice-of-law provisions.[9]  At a minimum, then, *Breeding* indicates that the Kentucky courts will not automatically honor a choice-of-law provision, to the exclusion of all other considerations. Rather, despite a choice-of-law clause in the accidental death policy, the *Breeding* Court weighed the relative interests of Kentucky and Delaware in deciding which law to apply. Further, in

---

[9]Under § 187, a choice-of-law clause will be enforced unless either:

    (a)  the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

    (b)  application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2).  While *Breeding* does not cite this provision, it indirectly incorporates the "fundamental policy" standard, holding that "[n]otice of limitations to the insurance coverage provided an insured is a fundamental policy of this commonwealth." *Breeding*, 633 S.W.2d at 720.

---

an abandonment of the estates' claim, his failure to object to the proposal precludes his argument that the settlement was anything less than a fair compromise of Comerica's potential liability. Simply put, the debtors' estates can, and did, recover from Comerica for Honigman and Van Dresser's common damages. Any recovery by [Honigman] would benefit him twice; once as guarantor and again as creditor.

*In re Van Dresser Corp.*, 128 F.3d at 948-49.  Clearly, in the present case, we face no similar risk of a potential double recovery, because the Abrams brothers are seeking only a set-off against the amount of indebtedness claimed by Wallace Hardware, and not an affirmative recovery.[20]

Much more on point is our decision in *Coffey*, *supra*, which neither party cited in addressing the present issue on appeal. In that case, creditors L. Coleman Coffey and Robert Bruce Coffey asserted claims against the principal debtor, MOT, and also brought a separate suit against guarantor Thomas O. Moore. These two suits were consolidated, and the Coffeys brought summary judgment motions against both MOT and Moore, seeking entry of judgment on MOT's $5 million promissory note and Moore's guaranty of MOT's indebtedness. The day before these motions were to be heard, MOT filed for bankruptcy relief, and further proceedings against the principal debtor were stayed. The district court, however, entered summary judgment against Moore as guarantor, in an amount in excess of MOT's note.

On appeal, Moore argued that judgment could not be entered against him until the true amount of MOT's underlying obligation had first been determined. In particular,

---

[20]It is possible, of course, that there could be a risk of a "double set-off" here, if the trustee for Tri-County's bankruptcy estate already received some sort of credit for Tri-County's breach-of-contract claims as part of the bankruptcy settlement with Wallace Hardware. We discuss this possibility below.

Van Dresser Corporation, asserted various state-law tort claims against Comerica Bank, under the theory that the bank had contributed to the downfall of Van Dresser by aiding and abetting the depletion of assets of two of its subsidiaries. As a result of its financial difficulties, Van Dresser defaulted on two loans totaling $1,125,000, and Honigman was forced to repay them as co-signer and guarantor. Honigman argued that he was entitled to recover these personal losses in an individual tort suit against the bank.

We disagreed, and substantially affirmed the district court's dismissal of Honigman's state-law claims. In so holding, we pointed out that the bankruptcy trustees for Van Dresser and its two subsidiaries had already pursued claims against the bank during the course of the bankruptcy proceedings, that these claims had been settled, and that Honigman, as a creditor, had been given notice of the proposed settlement and had not objected. Thus, Honigman's separate claims amounted to an attempt to recover twice for the same tortious conduct:

> [Honigman] has cited no case for the proposition that a corporation and its shareholder can both recover fully for a single tortious action, and we conclude that none exists. The absence of case law on this point is not surprising, in light of the fact that the result for which Honigman argues cannot logically be sustained. The defendants here allegedly took a finite amount of money from [Van Dresser's subsidiaries] . . . . [T]hey cannot be required to repay the principal amount of $2.7 million more than once. If a thief steals a diamond necklace from a married couple, the husband cannot recover the value of the converted necklace from the thief after the wife has already recovered the necklace itself.
>
> . . . . [T]he estates' recovery here against Comerica makes Honigman whole in terms of the loss caused by Comerica. Although Honigman maintains that the trustees' minimal settlement with Comerica is in effect

making this determination, the Court gave virtually no weight to the choice-of-law provision.

In the present case, the District Court fully adopted *Breeding*'s analysis, and concluded that "Kentucky clearly has the greater interest." (8/23/96 Op. at 5, J.A. at 197.) The lower court observed that the Abrams brothers are Kentucky residents, Tri-County's store was located in Kentucky, and the Guaranty itself was executed in Kentucky. The sole contact with Tennessee, in the District Court's view, was Wallace Hardware's status as a Tennessee corporation. Conspicuously absent from this calculus was any discussion of the weight to be given to the parties' own choice of Tennessee law to govern their agreement. Presumably, the court below read *Breeding* as requiring a wholly interest-based inquiry, without regard for the choice of law set forth in the parties' contract.

We find this was error. Specifically, we do not believe that *Breeding* can be construed as broadly precluding parties from making a reasonable and binding choice as to the law that will govern their contractual relationship. In reaching this conclusion, we begin by noting the significant distinctions between *Breeding* and the present case. In *Breeding*, the accidental death policy and its choice-of-law clause were not the subject of any negotiations, arms-length or otherwise. Indeed, Mr. Breeding was never even given a copy of the policy, and he had no knowledge of its terms. The Court found that this failure to apprise Mr. Breeding of the policy's exclusions violated a Kentucky statute, the policy itself, and the "fundamental policy of this commonwealth." *Breeding*, 633 S.W.2d at 718-20. Further, even if the policy had been provided to Mr. Breeding, he would have learned only that it was to be governed by "the laws of the state of delivery of the policy." 633 S.W.2d at 719. He would not have been specifically informed that Delaware law would apply, nor would this have been apparent from the policy language.

Here, by contrast, the Abrams brothers were represented by counsel in their dealings with Wallace Hardware, and they

insisted that their attorney review the Guaranty before they would consider signing it. The one-page Guaranty provided, in plain language, that it was to be "governed by and construed in accordance with the laws of the State of Tennessee." (J.A. at 61.) There is nothing in the record before us that might suggest that the Abrams brothers were unaware of this provision, or that they lacked a full opportunity to consider its ramifications.

Moreover, while the District Court pointed to a "disparity in bargaining power" as one justification for its ruling, (12/19/97 Op. at 6, J.A. at 561), we find no evidentiary basis for this conclusion. Rather, this case apparently involves a fairly typical arms-length business transaction among parties of relatively equal bargaining power. Wallace Hardware's mere insistence on personal guaranties as additional security for its extension of credit to Tri-County does not amount to the sort of overreaching or oppressive conduct that might allow a party to evade its contractual obligations. *See Zeitz v. Foley*, 264 S.W.2d 267, 268 (Ky. 1954) ("[C]ontracts voluntarily made between competent persons are not to be set aside lightly."); *Carboline Co. v. Oxmoor Ctr.*, 40 U.C.C. Rep. Serv. (Callaghan) 1728, 1985 WL 185466 (Ky. Ct. App. 1985) (finding, in a sale of goods case governed by the UCC, that "in the sophisticated commercial setting of this transaction the provision of the parties' agreement excluding liability for consequential damages was not unconscionable"); *Prudential Resources Corp. v. Plunkett*, 583 S.W.2d 97, 100 (Ky. Ct. App. 1979) (enforcing a forum selection clause and finding no overreaching conduct, where the parties dealt with each other "at arms length" in executing a "sophisticated drilling contract"); *see also Forsythe v. BancBoston Mortgage Corp.*, 135 F.3d 1069, 1074 (6th Cir. 1997) (observing that in the Kentucky case law, "[t]he doctrine of unconscionability is only used in rare instances, such as when a party abuses its right to contract freely"); *L.K. Comstock & Co. v. Becon Constr. Co.*, 932 F. Supp. 948, 972-73 (E.D. Ky. 1994) ("Kentucky courts frequently have upheld parties' bargains, even if one-sided, examining all the circumstances

Plainly, the third of these exceptions applies here, since Tri-County has been placed in bankruptcy. "[I]t is well established that when the principal is insolvent, the guarantor may set-off the principal's claims against the creditor." *Continental Group*, 536 F. Supp. at 661 (citing cases). Of course, this is precisely what the Abrams brothers seek to do through the challenged affirmative defenses. Moreover, the first of these exceptions arguably applies as well, as "[s]everal courts have held that the principal's consent to the guarantor's assertion of claims will be presumed when the guarantor controls the principal." *Roulier*, 750 F. Supp. at 1061. According to the bankruptcy court, Lonnie Abrams was the "president and sole shareholder of Tri-County." (J.A. at 2.) Thus, there would appear to be ample basis for permitting the Abrams brothers to assert the "corporate" defenses at issue.

In arguing to the contrary, Wallace Hardware ignores the above-cited case law, and attempts instead to invoke decisions and apply "rules" that simply do not extend to the circumstances presented here. First, while it is true, as Wallace Hardware asserts, that a guarantor may not assert the "personal" defenses of the principal debtor, these "personal" defenses encompass such matters as infancy and duress, *see Rhode Island Bank*, 789 F.2d at 79 n.6, and not the breach-of-contract defense the Abrams brothers seek to advance here. Next, although a guarantor cannot pursue an *affirmative recovery* by pointing to the creditor's breach of its underlying contract with the principal debtor, the guarantor may invoke this same breach-of-contract theory *defensively* — subject, of course, to the general rule and exceptions set forth above — to achieve a *set-off* against the amount he otherwise would owe to the creditor. *See Continental Group*, 536 F. Supp. at 661-62.

This distinction between affirmative recoveries and defensive set-offs provides but one of several bases for distinguishing the present matter from the case upon which Wallace Hardware seeks to rely, *In re Van Dresser Corp.* In that case, Daniel Honigman, a shareholder of the bankrupt

Within these broad confines, we now turn to the specific question before us: whether the Abrams brothers may assert the breach-of-contract defenses that Tri-County could have asserted if sued directly on the underlying indebtedness.[19] "As a general rule, when a creditor sues a guarantor and does not name the principal debtor in the action, the guarantor is not entitled to raise defensively the claims of the principal debtor against the creditor." *First Texas Serv. Corp. v. Roulier*, 750 F. Supp. 1056, 1060 (D. Colo. 1990); *see also Rhode Island Bank*, 789 F.2d at 78 n.4. This general rule, however, extends only so far as necessary to serve its purpose, which is "to protect the claims of the principal, since the guarantor may not be in the best position to assert them." *Roulier*, 750 F. Supp. at 1061; *see also Continental Group, Inc. v. Justice*, 536 F. Supp. 658, 661 (D. Del. 1982) (observing that the general rule is "designed to protect the underlying claims of the principal and to minimize litigation among the parties"). Accordingly, the courts have recognized three exceptions to this rule:

A guarantor may assert the independent claim of the principal to set-off the creditor's claim against the guarantor where (1) the surety has taken an assignment of the claim or the principal has consented to the surety's use of the claim, (2) both principal and surety are joined as defendants, or (3) the principal is insolvent.

*Continental Group*, 536 F. Supp. at 661 (citing Restatement of Security § 133(2)).

---

[19] We note that Tri-County apparently did assert these matters as affirmative breach-of-contract claims in a suit brought against Wallace Hardware in Kentucky state court on December 17, 1991, and that Wallace Hardware in turn brought a breach-of-contract suit against Tri-County just two days later. In a settlement dated December 20, 1991, the parties agreed to allow Wallace Hardware to repossess the inventory it had sold to Tri-County, but expressly declined to waive any of their rights or causes of action against each other. (J.A. at 416.)

surrounding the transaction and the relative bargaining positions of the parties," and the "exceptional cases" deviating from this general rule have "involved one-sided, oppressive and unfairly surprising contracts, and not . . . the consequences per se of uneven bargaining power or even a simple old-fashioned bad bargain." (Internal quotations and citation omitted)). The Abrams brothers were free to negotiate changes to the Guaranty Agreement, or, failing that, to enter into a relationship with another supplier.[10] Further, the parties' choice of Tennessee law is not so inherently suspect as to support an inference of unfair advantage.

Given these crucial differences, we decline to read *Breeding* as dictating that no weight be given to the Guaranty's choice-of-law provision. Neither have we located any other Kentucky case suggesting that it is appropriate, in all circumstances, to displace the parties' express contractual agreement as to the governing law. To be sure, in *Harris Corp.*, *supra*, 712 F.2d at 1071, and again in *Adam*, *supra*, 130 F.3d at 230-31, we noted the tendency of Kentucky courts to apply their own law, even when a contractual provision might state otherwise. However, the state court decisions on which we relied, as well as *Harris Corp.* and *Adam* themselves, all arose from personal injuries suffered either within Kentucky or by Kentucky residents. *See Adam*, 130 F.3d at 221 (auto accident in Kentucky); *Harris Corp.*, 712 F.2d at 1070 (plane crash in Kentucky); *Grant v. Bill Walker Pontiac-GMC, Inc.*, 523 F.2d 1301, 1303 (6th Cir. 1975) (auto accident in Kentucky); *Breeding*, 663 S.W.2d at 718 (accidental drowning in Kentucky); *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972) (auto accident in Ohio, but deceased passenger was Kentucky resident and fatal trip began and was to have ended there); *Arnett v. Thompson*, 433 S.W.2d 109, 113 (Ky. 1968) (auto accident in Kentucky);

---

[10] Indeed, given Bill Abrams' contention that he refused to sign the Guaranty, it cannot be said that he and his brother were somehow compelled to execute it.

*Wessling v. Paris*, 417 S.W.2d 259, 260 (Ky. 1967) (auto accident in Indiana, but both driver and passenger were Kentucky residents and trip began there). Most of these cases did not feature choice-of-law provisions — *Harris Corp.* and *Adam*, for example, did not — and none involved the alleged breach of a standard commercial contract.[11]

In contrast, two of the cases cited by the parties and the District Court did involve commercial contracts. First, in *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355 (Ky. Ct. App. 1987), the Kentucky Court of Appeals addressed a contract for the sale of land in Kentucky, which provided that Texas law would govern. The plaintiff sellers, a group of joint venturers, were Kentucky residents, while the defendant buyer, La Quinta, was a Texas corporation that wished to build a motel on the property. Five years after the sale was completed, the plaintiffs advised La Quinta that they planned to sell an adjacent parcel of property to another buyer for purposes of constructing a competing motel. When La Quinta responded that this would breach the parties' agreement, the plaintiffs brought suit, seeking a declaration that enforcement of the agreement was barred by a Texas four-year statute of limitations.[12]

---

[11] In this regard, it is worth noting that in *Harris Corp.*, we applied Ohio rather than Kentucky law in resolving one of the claims at issue, notwithstanding our initial recognition of the Kentucky courts' preference for choosing their own law. In so holding, we characterized this claim as "quasi-contractual" in nature, and distinguished "the question of negligence, unquestionably an issue to be resolved under the laws of Kentucky, with the question of the rights of the parties under a contract of employment," where we determined that Ohio law should govern. *Harris Corp.*, 712 F.2d at 1072.

[12] Thus, *Paine* featured the somewhat unusual circumstance that Kentucky residents sought to enforce the choice-of-law clause selecting another state's law, while the out-of-state defendant sought to apply local Kentucky law.

We begin our analysis of this issue by noting some basic principles of the law of guaranties. As guarantors,[18] the Abrams brothers are liable to Wallace Hardware only to the extent that the principal debtor, Tri-County, was liable to Wallace. *See Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1449 (6th Cir. 1993); *Rhode Island Hosp. Trust Nat'l Bank v. Ohio Casualty Ins. Co.*, 789 F.2d 74, 78-79 (1st Cir. 1986). Thus, for example, if Tri-County had brought suit and prevailed on the theories now asserted by the Abrams brothers as affirmative defenses, both Tri-County's and the Abrams' liability to Wallace Hardware would have been reduced by the amount of the judgment in that suit.

There are circumstances, however, in which a discharge of the principal debtor's liability does not extinguish the guarantor's liability. For instance, the terms of the guaranty itself may permit a creditor to compromise a claim against the principal debtor without discharging the guarantor's liability, and the courts generally will enforce such terms. *See, e.g.*, *United States v. Beardslee*, 562 F.2d 1016, 1022-24 (6th Cir. 1977); *Aetna Life Ins. Co. v. Anderson*, 848 F.2d 104, 107-08 (8th Cir. 1988). The Guaranty in this case so provides, stating that "Guarantor authorizes Wallace, without notice or demand and without affecting Guarantor's liability hereunder, from time to time to (a) renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the indebtedness or any part thereof." (J.A. at 61.) Also of relevance to this case is "[t]he general rule . . . that a discharge in bankruptcy does not affect a guarantor's liability." *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 918 (5th Cir. 2000) (citing 11 U.S.C. § 524(e)); *see also Coffey*, 992 F.2d at 1449.

---

[18] As noted earlier, Bill Abrams claims that he did not sign the Guaranty. For purposes of our present discussion only, however, we will assume that he is a guarantor of Tri-County's indebtedness to Wallace Hardware.

competent business advice and assistance, failed to provide inventory at a competitive cost, failed to provide competent assistance in the pricing of such inventory, and failed to provide favorable terms of financing and repayment." (Lonnie Abrams' Answer at ¶ 17, J.A. at 35.)  Likewise, although Bill Abrams' initial answer lacked these allegations, he subsequently sought and was granted leave to amend his answer to include these so-called "corporate defenses" challenging Tri-County's underlying indebtedness to Wallace Hardware.  As its second issue on appeal, Wallace Hardware contends that the District Court erred by allowing the Abrams brothers to assert these "corporate defenses."  While we do not fully subscribe to the reasoning of the court below, we find no error in its ultimate determination.

In arguing that these defenses should be stricken, Wallace Hardware first contends that the Abrams brothers lack "standing" to assert any defenses Tri-County might have put forward to challenge its underlying indebtedness to Wallace Hardware.  In addition, Wallace Hardware argues that these defenses belonged exclusively to the bankruptcy estate when the Chapter 7 proceeding was commenced against Tri-County, and that the defenses were waived or released when the bankruptcy trustee entered into a settlement with Wallace Hardware.  In support of these two contentions, Wallace Hardware relies principally on our decision in *Honigman v. Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945 (6th Cir. 1997).  Bill Abrams responds, and the District Court held, that the bankruptcy trustee's settlement with Wallace Hardware cannot bind the Abrams brothers because, under the standard set forth in *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054, 1069-70 (6th Cir. 1995), the trustee and the Abrams were not in privity. (12/19/97 Op. at 4, J.A. at 559.)  We believe that both Wallace Hardware's argument and Bill Abrams' response largely miss the point, as neither fully addresses the significance of the Abrams' status as guarantors of Tri-County's indebtedness.

Citing *Breeding* and *Harris Corp.*, the Court of Appeals conducted an interest-based analysis, and held that Kentucky's fifteen-year statute of limitations governed:

In the instant case, the property at the heart of the controversy is located in Kentucky, the sellers are in Kentucky, the buyers are in Kentucky by virtue of the franchisee, and the contract was apparently executed at least partially in Kentucky.  The only contacts Texas has are the location of the parent corporation and the source of the contract.  Our own citizens would have a cause of action in these circumstances, and our statute evinces a public policy that the legislature deems fifteen years to be an appropriate statute of limitations for written contracts.  We see no reason to circumscribe this policy vis-a-vis a foreign corporation having the enumerated contacts with this forum.

*Paine*, 736 S.W.2d at 357.  Again, as in *Breeding*, the Court gave no weight to the parties' express agreement as to the governing law.[13]

Next, in *Tractor & Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F. Supp. 1198 (W.D. Ky. 1995), the federal District Court considered a farm implement franchise agreement providing that Michigan law would apply.  The plaintiff franchisee, a Kentucky corporation, claimed that the defendant terminated the franchise agreement without good cause, in violation of an alleged oral agreement that the relationship would continue absent the plaintiff's poor performance, and in violation of Michigan's Franchise Investment Law.  The defendant, a Delaware corporation that

---

[13]In addition, we note that *Paine*'s choice-of-law ruling was essentially dicta, as the Court next concluded that La Quinta could timely assert a breach-of-contract claim even under the Texas four-year statute of limitations.

dealt with the plaintiff primarily through its Michigan branch office, argued that Kentucky law should apply.[14]

Upon reviewing the decisions in *Breeding* and *Paine*, the Court found both were distinguishable. First, the Court observed that *Breeding* "involved a relatively non-specific designation of the applicable substantive law," and that the defendant insurer could not "claim that it would be deprived of clearly ascertained and bargained-for rights if the forum state's law were applied, since the company conducted business and delivered policies in Kentucky." 898 F. Supp. at 1202. The Court further noted that the policy in *Breeding* was a "contract of adhesion, and a decision to apply its choice of law provision would have resulted in a substantial injustice to the insured." 898 F. Supp. at 1202. As for *Paine*, the Court observed that it involved a choice among two states' statutes of limitations, so that "the court's decision in *Paine* was well in keeping with the tradition to apply the procedural law of the forum state, regardless of the choice of law decision regarding substantive issues." 898 F. Supp. at 1203.

Having surveyed and distinguished these prior decisions, the Court turned to the case before it, and elected to enforce the franchise agreement's choice-of-law clause:

> The Court is confronted with conflicting choices, each having a certain appeal. Nevertheless, the decision is a clear one. Although the Sixth Circuit stated in *Harris Corp., supra,* that "Kentucky applies its own law unless there are overwhelming interests to the contrary," a more fundamental goal of contract law is to uphold clearly ascertained and negotiated contract rights. To permit a drafter of the choice of law provision to challenge its legality is unpalatable to say the least. If any ambiguities in a contract are to be construed strictly against the

---

[14]Thus, as in *Paine*, the Kentucky resident sought to apply Michigan law, while the out-of-state defendant maintained that Kentucky law should govern.

law is to uphold clearly ascertained and negotiated contract rights," and "public policy in Kentucky favors parties' freedom to contract for substantive rights." *Tractor & Farm Supply*, 898 F. Supp. at 1203. Nothing in the record before us suggests that the Abrams brothers lacked knowledge of, or an opportunity to review, the terms of the Guaranty they were being asked to sign, including its choice-of-law provision. They received the benefit of the bargain in this transaction when Wallace Hardware extended credit and provided inventory that allowed them to open their hardware store. We see no reason to deny Wallace Hardware a benefit for which it bargained in this same transaction — namely, the right to apply Tennessee law in construing and enforcing the Guaranty. Accordingly, we reverse the District Court's application of Kentucky law in resolving Wallace Hardware's breach-of-guaranty claim, and we reinstate and remand this claim to the lower court for adjudication under Tennessee law.[17]

**B.    The Abrams Brothers Are Entitled to Assert Tri-County's Breach-of-Contract Defenses in Contesting Wallace Hardware's Claims.**

In his answer to Wallace Hardware's initial complaint, Lonnie Abrams alleged that his purported liability under the Guaranty was reduced or eliminated by virtue of Wallace Hardware's prior breach of its agreement with Tri-County. More specifically, he alleged in his answer that Wallace Hardware "failed to provide competent assistance in the maintenance of proper inventory levels, failed to provide

---

[17]The District Court also relied on Ky. Rev. Stat. Ann. § 371.065 in dismissing Count II of Wallace Hardware's amended complaint. Count II rests upon the Operating Agreement, which, unlike the Guaranty, lacks a choice-of-law provision. In light of this significant distinction, we affirm the District Court's dismissal of Count II, finding no error in its decision to apply Kentucky law — and specifically § 371.065 — in ruling that the Operating Agreement did not operate to render the Abrams brothers personally liable for Tri-County's debt.

Indeed, though Wallace Hardware has acknowledged the Guaranty's failure to comport with the literal terms of § 371.065, we note that the purposes behind that statute were largely served here. Although the Guaranty was neither written on nor expressly refers to the underlying instrument being guaranteed, it does provide that the guarantors' promise to pay encompassed Tri-County's "obligation pursuant to a certain note(s), accounts receivable, and/or security agreement executed by [Tri-County] in favor of Wallace on the date hereof." (J.A. at 61.) Thus, the Abrams brothers could not have been uncertain — and, importantly, they do not claim any uncertainty — as to the indebtedness they were agreeing to repay, particularly since both brothers signed the contemporaneous Operating Agreement and Lonnie Abrams signed the Security Agreement. Moreover, given the short duration of the parties' relationship, there can be no claim that Wallace Hardware subsequently expanded the scope of the Abrams' obligations beyond the parties' contemplation when they executed the Guaranty. Rather, so far as the record reveals, these obligations extended only to the hardware inventory supplied by Wallace in accordance with the Operating Agreement. In short, there was no overreaching here of the sort addressed by the Kentucky statute, either in the terms of the Guaranty itself or in the parties' subsequent conduct under their agreements.

Finally, we should not overlook the fact that § 371.065 represents only *one* of the policies in play here. As observed in *Tractor & Farm Supply*, a "fundamental goal of contract

---

that this result comports with Restatement § 187 and its commentary, which states that "[t]he more closely the state of the chosen law is related to the contract and the parties, the more fundamental must be the policy of the state of the otherwise applicable law to justify denying effect to the choice-of-law provision." Restatement (Second) of Conflict of Laws § 187 cmt. g. Upon applying this "sliding scale" approach here, we conclude that Kentucky's interest is not so "fundamental," under the facts of this case, to render the Guaranty's choice-of-law provision unenforceable.

drafter, the Court does not consider binding Defendant by its own provision to be much of a logical leap. Moreover, given that Defendant had substantial contacts with Michigan at the time of the contract's creation, which renders the choice of Michigan law highly reasonable, Plaintiff should be entitled to rely on the signed agreement. Finally, public policy in Kentucky favors parties' freedom to contract for substantive rights. Consequently, the Court will uphold the choice of law provision and will interpret the contract in accordance with Michigan law.

898 F. Supp. at 1203 (citations omitted).

As is plain from the foregoing recitation, the case law does not provide a definitive answer to the question before us. The cases that are factually most similar to this one, *Paine* and *Tractor & Farm Supply*, reach contrary results. If *Paine*, a Kentucky Court of Appeals decision, were squarely on point, we would be obliged to follow it unless "convinced by other persuasive data that the highest court of the state would decide otherwise." *Ziebart Int'l Corp. v. CNA Ins. Cos.*, 78 F.3d 245, 250-51 (6th Cir. 1996) (internal quotations and citations omitted). But, as noted in *Tractor & Farm Supply*, *Paine* implicated an issue not presented here: the distinction between substantive and procedural law. *See Tractor & Farm Supply*, 898 F. Supp. at 1203; *see also Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998) ("[C]ontractual choice-of-law clauses incorporate only substantive law, not procedural provisions such as statutes of limitations."). And, more importantly, neither *Paine* nor any other state court decision expressly informs us whether the Kentucky courts would be willing to apply § 187 of the Restatement in a proper case.

Turning to *Tractor & Farm Supply*, we note first that we need not defer to this federal District Court explication of an issue of Kentucky law. *See Salve Regina College v. Russell*, 499 U.S. 225, 238-39, 111 S. Ct. 1217, 1224-25 (1991). In any event, that case also is distinguishable from this one, as

it featured a contracting party's attempt to nullify a choice-of-law clause inserted in the contract at its own insistence. To be sure, *Tractor & Farm Supply* directly weighs in on the question before us, employing a § 187 analysis to uphold a choice-of-law clause. Yet, that case serves as dubious authority on this point, since the Court applied § 187 only after first stating that *Breeding* had done so. *See Tractor & Farm Supply*, 898 F. Supp. at 1202. In fact, as we observed earlier, *Breeding* applied § 188 of the Restatement, and did not even mention § 187.

In short, we find no clear signposts in the prior decisional law. Nevertheless, we conclude that, in a standard commercial breach-of-contract case such as we have here, the Kentucky courts would choose to adopt § 187 of the Restatement as their analytical framework for addressing a contractual choice-of-law clause. Initially, we note that *Breeding* itself lends considerable support to this conclusion. While the Kentucky Supreme Court did not cite § 187 in that decision, its analysis precisely tracked the language of that provision. First, just as § 187 calls for rejection of a choice-of-law clause where "the chosen state has no substantial relationship to the parties or the transaction," *Breeding* found that the chosen state in that case, Delaware, had "no significant relationship to the transaction and the parties." *Breeding*, 633 S.W.2d at 719. Next, just as § 187 asks whether "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest," *Breeding* held that the application of Delaware law would violate a "fundamental policy" of Kentucky to see that insureds are given notice of limitations to their insurance coverage. 633 S.W.2d at 720. Thus, we view *Breeding* as employing a § 187 analysis, albeit only implicitly.

We also find ourselves in agreement with a portion of the District Court's reasoning in *Tractor & Farm Supply*, a case that, as noted earlier, fairly closely resembles this one. As the Court emphasized in that case, a "fundamental goal of

embody a "fundamental" state policy if it is "designed to protect a person against the oppressive use of superior bargaining power," and we cited as an example a statute "involving the rights of an individual insured as against an insurance company." 814 F.2d at 1123 (quoting Restatement (Second) of Conflict of Laws § 187 cmt. g). We then concluded that the statute at issue in that case, the Ohio Business Opportunity Plans Act, did not advance a fundamental state policy, reasoning that the contract in question was not the product of "unequal bargaining strength," but had been "freely negotiated by aggressive and successful business executives, untainted by the suspicion and misgivings characteristic of adhesion contracts." 814 F.2d at 1123.

In this case, the Abrams brothers point to the bare enactment of § 371.065 as proof of a "fundamental" policy, and they cite no additional authority for this proposition. To be sure, the Kentucky statute on its face reflects a desire to protect against overbroad guaranties of indebtedness made without adequate disclosure. We may presume, then, that the statute is intended to protect against the misuse of superior bargaining power in the context of credit transactions. Yet, as we have already noted, the evidence in this case reveals an arms-length transaction between parties represented by counsel, and not a contract of adhesion dictated by one party. Consequently, while § 371.065 might well vindicate a "fundamental" policy in other instances, we find no basis for concluding that Kentucky has a "fundamental" interest, under the facts of this case, in protecting the Abrams brothers against having to comply with the terms of their arms-length agreement with Wallace Hardware.[16]

---

[16] Our decision in *Tele-Save*, *supra*, has been criticized for engaging in a case-specific inquiry to determine whether a state's policy is "fundamental." *See Tele-Save*, 814 F.2d at 1125 n.1 (Milburn, J., dissenting); *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 743 & n.4 (8th Cir. 1989) (Heaney, J., dissenting). Plainly, we are committing the same "transgression" here. We believe, however,

as guarantors.    Tennessee law, however, imposes no comparable restrictions upon the form and content of guaranties. Thus, as the lower court recognized, the choice-of-law determination is truly dispositive of Wallace's breach-of-guaranty claim.

This leads to the question whether Kentucky's statutory restrictions on guaranties represent a "fundamental policy" of that state.  In arguing that they do not, Wallace Hardware asserts that Kentucky's interests do not extend to contracts between private parties, and that "Kentucky does not care whether the Abrams must pay or not pay Wallace Hardware" under the Guaranty. (Appellant's Br. at 27.)  We cannot accept this narrow view of Kentucky public policy. Surely, the Kentucky legislature's enactment of § 371.065 evinces its concern with wholly "private" transactions involving guaranties, and its desire to protect its residents against open-ended and overreaching obligations to repay indebtedness. These are sufficient "state interests" to warrant further inquiry under the "fundamental policy" prong of § 187. Contrary to Wallace Hardware's assertion, we know of no requirement that a law must touch upon matters of uniquely "public" concern in order to constitute a state's "fundamental policy." *Cf. Banek*, *supra*, 6 F.3d at 362 (finding that a Michigan statute regulating franchise agreements between private parties "represents Michigan public policy").

Nevertheless, Kentucky's enactment of § 371.065 is not enough, standing alone, to invalidate the parties' choice of Tennessee law. "The fact . . . that a different result might be achieved if the law of the chosen forum is applied does not suffice to show that the foreign law is repugnant to a fundamental policy of the forum state." *Johnson*, 191 F.3d at 740; *see also* Restatement (Second) of Conflict of Laws § 187 cmt. g.  Rather, "it must be shown that there are significant differences in the application of the law of the two states." *Tele-Save Merchandising Co. v. Consumers Distrib. Co.*, 814 F.2d 1120, 1123 (6th Cir. 1987).  Further, in *Tele-Save*, we quoted the Restatement's commentary that a statute may

contract law is to uphold clearly ascertained and negotiated contract rights." 898 F. Supp. at 1203.  Kentucky's express recognition of this principle in the choice-of-law context is evidenced by its adoption of § 1-105 of the Uniform Commercial Code ("UCC"), which gives effect to the contracting parties' agreement as to the law that "shall govern their rights and duties" in a given UCC transaction. Ky. Rev. Stat. Ann. § 355.1-105(1).  Wallace Hardware does not contend on appeal that this UCC provision directly controls the Guaranty at issue.[15]  Nonetheless, Wallace Hardware

---

[15] In the court below, Wallace Hardware argued that UCC § 1-105 should apply to the Guaranty and its choice-of-law provision, because the Guaranty was intended to serve as additional security for an underlying sale of goods governed by Article 2 of the UCC.  The District Court rejected this contention, relying on two Fifth Circuit decisions holding that "[t]he execution of a guaranty is not a Code transaction." (8/23/96 Op. at 3-4, J.A. at 195-96 (citing *Uniwest Mortgage Co. v. Dadecor Condominiums, Inc.*, 877 F.2d 431, 434 (5th Cir. 1989), and quoting *EAC Credit Corp. v. King*, 507 F.2d 1232, 1238 (5th Cir. 1975)).)  Wallace Hardware apparently has abandoned this argument on appeal. (*See* Appellant's Br. at 34, n.31.)

This issue, had Wallace Hardware elected to pursue it, would have been a close one.  On one hand, the lower court's ruling comports with the (admittedly sparse) case law on this issue.  While we have never considered whether a guaranty executed in connection with a UCC transaction is itself governed by the UCC, those courts that have addressed this question have unanimously held that such guaranties are separate agreements not reached by the UCC. *See, e.g.*, *FDIC v. Nobles*, 901 F.2d 477, 480 (5th Cir. 1990); *Uniwest Mortgage*, 877 F.2d at 434-35; *EAC Credit Corp.*, 507 F.2d at 1238; *Union Planters Nat'l Bank v. Markowitz*, 468 F. Supp. 529, 534 (W.D. Tenn. 1979); *Guarantor Partners v. Huff*, 830 S.W.2d 73, 76 (Tenn. Ct. App. 1992); *Brooks v. United Kentucky Bank*, 659 S.W.2d 213, 215 (Ky. Ct. App. 1983). Moreover, the decision most closely on point, *Uniwest Mortgage*, squarely held that common-law rather than UCC choice-of-law principles governed the guaranty at issue in that case.  Yet, we recognize that there is a degree of inconsistency in the result here, where Wallace Hardware is denied the benefit of UCC § 1-105 but, as discussed below, the Abrams brothers are permitted to assert defenses arising from Tri-County's underlying UCC-based sale-of-goods transaction with Wallace Hardware. Further, it makes sense to view the Guaranty as part and parcel of a UCC

asserts, and we agree, that UCC § 1-105 demonstrates Kentucky's willingness to allow the parties to a contract to select the law that will govern their relationship, as well as its determination to enforce a reasonable choice of law.

Finally, we cannot overlook the general tendency of the Kentucky Supreme Court to look to a variety of other Restatement provisions in resolving choice-of-law and related issues. *See*, *e.g.*, *Beaven v. McAnulty*, 980 S.W.2d 284, 288 (Ky. 1998) (applying § 84 of the Restatement (Second) of Conflict of Laws); *Prezocki*, *supra*, 938 S.W.2d at 889 (applying § 80 of the Restatement); *Breeding*, 633 S.W.2d at 719 (applying § 188); *Lewis*, *supra*, 555 S.W.2d at 581-82 (applying §§ 188 and 193) . We see no basis for concluding that § 187 is somehow disfavored by the courts of that state; rather, the more logical conclusion to be drawn from the case law is that the proper occasion has not yet arisen for adopting that provision. Simply stated, we believe we are confronted with such circumstances here. Thus, while we acknowledge that we are writing on something of a blank slate, we find that § 187 of the Restatement sets forth the appropriate standards for determining whether to enforce the Guaranty's choice of Tennessee law.

### 2. Under § 187 of the Restatement, the Guaranty's Choice-of-Law Clause Is Enforceable.

As noted above, the District Court did not consider § 187 of the Restatement in making its choice-of-law determination. Instead, it employed a purely interest-based approach and, in so doing, accorded no weight whatsoever to the parties' written agreement that Tennessee law would govern their contractual relationship. Upon applying § 187 to the facts of

---

sale-of-goods transaction, rather than as a wholly separate undertaking, where the former never would have existed without the latter. Nevertheless, in light of our separate common-law basis for concluding that the Guaranty's choice-of-law clause is enforceable, we leave this interesting question for another day.

this case, and adding the parties' choice of law to the other factors addressed by the court below, we find that the balance tips decisively in favor of enforcing the Guaranty's selection of Tennessee law.

Under § 187, the parties' choice of law should be honored unless (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (2) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest." Restatement (Second) of Conflict of Laws § 187. The first prong of this test is easily satisfied here. Wallace Hardware is located in Tennessee, and Tri-County elected to do business with, and purchase goods from, this Tennessee corporation. Further, when Tri-County defaulted on its contractual obligations, the injury was felt by Wallace in Tennessee. This provides a sufficiently reasonable basis for the parties' choice of Tennessee law. *See Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 739-40 (6th Cir. 1999).

The second, "fundamental policy" prong of § 187 presents a closer question. The District Court invalidated the Guaranty on the basis of a Kentucky statute providing:

> No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates.

Ky. Rev. Stat. Ann. § 371.065(1). Wallace Hardware concedes that the Guaranty did not comply with this statute, as it was drawn up separately from the underlying Operating Agreement and Security Agreement between Wallace and Tri-County, it did not expressly refer to those agreements, and it did not specify the maximum liability of the Abrams brothers