**AMERICAN FARM MORTGAGE COMPANY, INC., Plaintiff,**

v.

**AG AMERICA, FCB/WESTERN FARM CREDIT BANK, Defendants.**

**Civil Action No. 3:00CV–797–H.**

United States District Court,
W.D. Kentucky,
at Louisville.

Oct. 31, 2002.

---

Lisa Koch Bryant, Foley, Bryant & Holloway, Louisville, KY, for plaintiff.

Stanley W. Whetzel, Jr., Louisville, KY, for defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

This is a contract dispute where the parties disagree about the appropriate remedy for breach. Plaintiff, American Farm Mortgage ("AFM"), seeks a declaration that it may select between three alternatives to remedy the acknowledged breach of contract. Western Farm Credit Bank ("Western") responds that AFM does not have the option to select the remedy for its own breach of the agreement. Western also countered for breach of contract and negligence.[1] The parties have now filed cross-motions for summary judgment. The Court will address the remedy issue as well as several other less important questions which the parties raise.

---

1. Defendant, Ag America, FCB, was dismissed by Agreed Order entered February 14, 2002. During the relevant time period, Western transacted business under the name "Ag-Funding." The contract at issue refers to Western as AgFunding. Western pled its negligence claim in the alternative. Because the Court determines that a valid and binding contract existed between the parties, there is no need to for it to consider Western's negligence claim. In particular, the Court does not make any determination regarding whether Western's negligence claim is barred by the economic loss doctrine.

## I.

The material facts are undisputed. AFM is engaged in the business of originating agricultural loans and selling them to investors. Western purchases agricultural loans of a specific minimum quality and pools them for resale to the Federal Agricultural Mortgage Company ("Farmer Mac"). On June 30, 1995, Western and AFM entered into a Seller/Servicer Agreement (the "Agreement"). The purpose of the Agreement was to establish AFM as an approved seller of qualified loans to Western for ultimate resale to Farmer Mac. The Agreement, which was drafted by counsel for Western, incorporates by reference a comprehensive manual called the Selling & Servicing Guide (the "Guide"). The Guide, also drafted by Western, lays out in detail the terms and conditions that govern the sale of AFM loans to Western.

In January 1996, Robert and Mavis Smerker (the "Smerkers") approached Stanley Frizzell, an AFM agent, about obtaining a $640,000.00 agricultural loan to finance their acquisition of a new farming and ranching operation in Montana.[2] AFM approved the loan and on August 1, 1996, extended the agricultural loan in exchange for the Smerkers' promissory note and mortgage. AFM intended the mortgage to encumber all the Smerkers' agricultural land in Montana, approximately 4,380 acres. On August 27, 1996, pursuant to the terms of the Agreement, AFM sold the Smerker note and mortgage to Western. Western planned to pool the loan with other qualified loans for its April 1997 sale to Farmer Mac.

The Smerkers failed to make their first annual loan payment due on April 1, 1997. Although the Smerkers finally brought the loan current on June 4, 1997, their late payment violated Farmer Mac standards for acceptance and securitization of the loan. Consequently, Farmer Mac asserted its right to reject the Smerker loan, and required Western to repurchase the loan. Western completed the repurchase of the Smerker loan on September 2, 1997.

The Smerkers next annual mortgage payment in the amount of $64,843.50 was due on April 1, 1998. The Smerkers failed to make that payment. After an investigation, Western concluded that the Smerkers would never be able to satisfy their loan obligations. Western believed that a complete liquidation of the Smerkers' assets or foreclosure were the only viable options. When the Smerkers refused to liquidate, Western filed a foreclosure action in a Montana state court. As part of their answer, the Smerkers asserted an affirmative defense that their promissory note violated Montana's usury statutes. The Smerkers' usury defense was never adjudicated, however, because the Smerkers and Western entered into a settlement agreement.[3]

During the settlement discussions Western learned for the first time that the Smerker mortgage did not include all of the originally intended 4,380 acres. As it turns out, through mistake and inadvertence, approximately 840 acres were omitted from the seven page legal description in the Smerker mortgage.[4] The Smerkers later mortgaged the omitted acreage to the First Security Bank of Havre. On

---

2. Although the Smerkers' loan and mortgage are the subject of this lawsuit, the Smerkers are not parties to the suit.

3. Western agreed to dismiss the foreclosure suit without prejudice in exchange for a deed in lieu of foreclosure from the Smerkers.

4. There has been some confusion regarding the exact amount of omitted acreage. At various times, Western has given different estimates of the amount of omitted acreage ranging between 780 and 840 acres. Western now contends that 840 acres were omitted.

September 19, 2000, Michael Morris, Western's assistant vice-president, notified AFM's counsel of the impaired collateral issue. Mr. Morris stated that: "We [Western] will not move forward with this action for the next 15 days to allow time for you [AFM] to decide how you will rectify this situation. Under the Agreement, you have the option to cure, replace the loan with another loan that is satisfactory to us, or repurchase the loan." (Letter from Morris to Hayes of 09/19/2000, at 2.) AFM admitted that the impaired collateral would constitute a breach of the Agreement and requested a copy of the Smerker file to evaluate its options under the Agreement. For the next two months ÁMF and Western argued about the appropriate remedy provided for in the Agreement. Western rejected AFM's offer to cure and insisted that the only acceptable option was for AFM to repurchase the Smerker loan. Shortly thereafter, AFM filed this declaratory judgment action.

### II.

■ A federal court sitting in a diversity action must apply the choice of law rules of the forum state. *See Wallace Hardware Co., Inc. v. Abrams,* 223 F.3d 382, 391 (6th Cir.2000). Although the Agreement contains a California choice of law provision, this is not necessarily determinative of the issue. *See id.* (noting that Kentucky courts do not always honor choice of law provisions).[5] The Sixth Circuit has held that "in a standard breach-of-contract case ... the Kentucky courts would choose to adopt § 187 of the *Restatement (Second) of Conflict of Law* (1971) as the analytical framework for addressing a contractual choice-of-law clause." *Ennes v. H & R Block Eastern Tax Services, Inc.,* —— F.Supp.2d ——, ——, 2002 WL 226345 at *1 (W.D.Ky. Jan.11, 2002) (*quoting Wallace Hardware Co. Inc.,* 223 F.3d at 397.) Section 187(2) of the *Restatement* provides that a choice of law provision will be enforced unless either:

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the law of § 188, would be state of the applicable law in absence of an effective choice of law by the parties.

*Restatement (Second) of Conflict of Law* § 187(2).

The first prong of the test is met, as California has a substantial relationship to the parties and the transaction between them. Western has its principal place of business in Sacramento, California. The Agreement evinces that the parties contemplated AFM would make loan sales to Western in California and that Western would pool the loans together for sale to Farmer Mac in California. All AFM's correspondence with Western were directed toward California and the Smerker loan file is located in California. These facts establish a reasonable basis for the choice of California law. As to the second prong, the only other states with any plausible interest in the outcome of the this suit are Montana and Kentucky. However, Montana's interest is minimal at best. The Court can find no reason why applying

---

**5.** The Court must make this determination even though neither party challenges its validity.

California law would violate a fundamental policy of Montana.

Whether applying California law would violate a fundamental policy of Kentucky poses a slightly more difficult question. Under the *Restatement,* before the Court can displace the California choice of law provision as contrary to Kentucky's public policy, it must determine that Kentucky "has a *materially greater interest* than the chosen state in the determination of the particular issue." *Restatement (Second) of Conflict of Law* § 187(2)(b). As noted above, Western is located in California, the contract was drafted in California, and was to be performed, at least in part, in California. The contract was an arm's-length transaction, with each side represented by competent counsel. While Kentucky may have some interest in the outcome of this litigation based on AFM's location in the state, its interest is not "materially greater" than California's interest. Therefore, the Court will honor the parties' choice of California law.[6]

### III.

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ.Code § 1638. In interpreting a contract, the court should "view the language in light of the instrument as a whole and not use a disjointed, single-paragraph, strict construction approach." *City of El Cajon v. El Cajon Police Officers' Assn.,* 49 Cal.App.4th 64, 71, 56 Cal. Rptr.2d 723, (Cal.App.1996). "A contract must be so interpreted as to effect the mutual intentions of the parties as it exist-

ed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ.Code § 1636. If the Court finds any ambiguity, "it should be interpreted most strongly against the party that caused the uncertainty to exist." Cal. Civ.Code § 1654. Keeping these basic principals of contract interpretation in mind, the Court now turns to the contractual dispute at hand. The most significant of these disputes concerns the omission of 840 acres from the legal description in the Smerkers mortgage.

### A.

■ AFM admits that its omission of the 840 acres constitutes a breach of the Agreement. The parties dispute whether AFM has a right under the Agreement to "cure" the breach by reimbursing Western the value of the omitted acreage. AFM contends that it has the option to choose between three remedies—cure, replacement or repurchase.[7] Western argues that under the Agreement it may require a specific remedy.

The Agreement provides:

2.2 *Basic Seller Obligations.* There are certain basic obligations imposed upon the Seller under this Agreement, including but not limited to obligations to:

● sell Qualified Loans to AgFunding once a Commitment to Purchase has been issued by AgFunding[8]

● pay a Non Delivery Fee to AgFunding in the event a Qualified Loan is not delivered in accordance with the terms

---

**6.** The Court's decision to uphold the choice of law provision is not determinative because Kentucky and California's substantive contract interpretation principals are substantially the same.

**7.** Under § 203.5 "a seller's right to replace any mortgage loan ... expires on the second

anniversary of the date the Qualified Loan is included in the mortgage pool." (Guide, § 203.5). The parties agree that this provision precludes AFM from selecting the replacement option in this case.

**8.** AgFunding and Western are the same entity.

of such Commitment to Purchase, as set forth in 303.5 of the Guide; and

- make representations and warranties with respect to each Qualified Loan and incur certain consequences in connection with the breach of such representations and warranties, as set forth in 202 and 203 of the Guide.

The pertinent sections of the Guide provide:

### 203.2 Cure, Replacement or Repurchase

The Seller will be required to cure, replace (with a mortgage loan satisfactory to AgFunding) or repurchase a Qualified Loan sold to AgFunding:

1. If any breach of a representation or warranty is discovered prior to securitization that prevents the related mortgage loan from being included in a mortgage pool; or

2. If there is a breach of any representations or warranties contained in any one of the following paragraphs of 202.4:

   - **Loan file Contains Required Documents,** to extent it relates to items 2 through 5 of 302.4 (mortgage file contains the Mortgage, Mortgage Note, Assignment of Mortgage, and Appraisal). (202.4, # 3)

   - **Qualified Loan** (202.4, # 4)

   - **No Related Borrowers** (202.4, # 5)

   - **Principally Secured By Real Property/Sole Source of Collateral** (202.4, # 6)

   - **First Lien on Property** (202.4, # 7)

   - **Documents are Valid and Enforceable** (202.4, # 9)

   - **Mortgage Contains Customary Provisions** (202.4, # 10)

   - **No Cancellation or Subordination** (202.4, # 20)

- **Mortgage is in Good Standing** (202.4, # 21)

- **No Environmental Hazards** (202.4, # 29)

- **No Condemnation Proceedings Pending** (202.4, # 30)

### 203.3 Breach of Any Other Representations or Warranties

If any representation or warranty other than those specifically listed in 203.2 above is untrue, and the untruth results in a loss or expense or will result in a loss or expense, as determined by the Trustee in consultation with AgFunding, the Seller is obligated to pay the amount of such loss or expense (including the related Yield Maintenance Amount), which shall be deemed a cure of the untruth. Even though the Seller is not required to do so, the Seller has the right in its sole discretion, to replace or repurchase the mortgage loan as to which the breach has occurred.

### 203.4 Repurchase Price

If the Seller selects the repurchase option set forth in 203.2 or 203.3 it may pay the repurchase price, which may vary depending upon whether AgFunding has aggregated the Qualified Loan with other Qualified Loans into a mortgage pool (a "securitized transaction") has to which Farmer Mac as provided a guarantee.

### 203.6 Notice and Timing

The Seller shall satisfy its obligations under 203.2 or 203.3 within 60 days after either the Seller's discovery of the breach or receipt of notice by Seller from AgFunding, the Trustee, or Farmer Mac (whichever occurs first).

Read as a whole, these sections of the Agreement are quite clear. The Agreement provides three alternative remedies in the event of a breach: (1) cure, (2)

replacement, or (3) repurchase. (Guide, § 203.2.) The "will be required" language suggests that the Seller (AFM) must select one of the remedial options. True, one could argue that the language does not specify who is to select the remedy. The Court views the language as imposing a duty upon the seller (AFM) to choose one of the remedial options. Moreover, considering § 203.2 and § 203.4 together, the only plausible consistent interpretation is that AFM may choose the remedy. Section 203.4 explicitly states it is the seller who gets to *select* which remedy it wants to pursue under the circumstances. (Guide, § 203.4.) Section 203.4 re-enforces § 203.2 and leaves no doubt that under the Agreement the seller, AFM, has the right to choose between the three available remedies. Western has failed to articulate any plausible reason why this interpretation should not control.

Western's first argument is that the breach caused it to purchase a loan from AFM that it could never have rightly resold to Farmer Mac. Farmer Mac requires the loans it purchases to meet certain minimum standards. Western presented the Court with evidence that the missing collateral would have prevented the Smerker loan from qualifying for resale to Farmer Mac. Although this may be true, it does not change the terms of the Agreement which provides three options for remedying a breach. Western could have insisted on an exception in the Agreement that would have required "repurchase" in situations like the present where a collateral shortage prevents a loan from being qualified under the Agreement. However, no such exception appears, and the Court will not rewrite the Agreement to fit these

special circumstances. *See Erlich v. Menezes,* 21 Cal.4th 543, 558, 87 Cal.Rptr.2d 886, 981 P.2d 978 (Cal.1999) ("The parties to the contract in essence create a mini-universe for themselves ... in which they define their respective obligations, rewards and risks ... it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law.") Moreover, there is nothing inherently unfair about the cure remedy in these circumstances.

■ Western' second argument is that AFM did not elect its remedy within the time limitations set forth in section 203.6, which requires a breaching seller to remedy its breach within 60 days following either the earlier of the seller's discovery of the breach or notice of the breach. (Guide, § 203.6.) Western argues that AFM forfeited its right to select its remedy under the Agreement when it failed to notify Western of its decision to cure within 60 days of receiving notice of the impaired collateral. Even if the Court adopted Western's interpretation of this section of the Agreement,[9] AFM would still retain its right to elect a remedy under these facts. Western first notified AFM of the impaired collateral on September 19, 2000. Thus, under the Agreement, Western had until November 18, 2000, 60 days after notification of the breach, to select its remedy. Yet, Western attempted to cut short AFM's election time under the Agreement and demanded that AFM make a decision within fifteen days of the notification. (Letter from Morris to Hayes of 09/19/2000, at 2) ("We [Western] will not move forward with this action for

9. The Court would, in fact, lean toward AFM's side of the argument. The Agreement is ambiguous regarding the effect of such a failure. That ambiguity must be resolved against Western. Therefore, a delay would not necessarily require forfeiture of the seller's right to elect a remedy under the Agreement. Instead, a reasonable interpretation would be that under this section the seller would be responsible for any damages resulting from its delay in selecting a remedy.

the next 15 days to allow time for you [AFM] to decide how you will rectify this situation.") After receiving notification of the breach, AFM contacted Western and requested a copy of the Smerker file so that it could evaluate its options under the Agreement. On November 10, 2000, Western sent AFM a letter in which it stated that it would allow AFM to review the file in California and that it would give AFM until November 29, 2000, to repurchase the loan. (Letter from Heringer to Hayes of 11/10/2000, at 2) ("should AMF fail to repurchase the loan by November 29, 2000, for any reason we [Western] will have no choice but to immediately commence litigation.").[10] AFM was not able to review the Smerker file, until November 20, 2000, two days after the 60 day election period ran under the Agreement, but nine days prior to Western's extension. Thus, Western's conduct during the relevant period is inconsistent with an intention to enforce the 60 day election period. Western's failure to provide access to the Smerker file prior to November 20, 2000, and its affirmative rejection of any election of remedy other than repurchase, mitigates or waives any delay in AFM's election of remedies.

The Court concludes that under the Agreement, the selection of a remedy is left to AFM and under these facts, it may either cure the breach or repurchase the loan. At this time, the Court expresses no opinion on the amount of money necessary for AFM to cure its breach under the Agreement.[11]

### B.

■ The last two claims of breach are easier to resolve.[12] First, Western contends that when the Smerkers filed an affirmative defense and counterclaim alleging usury, they caused AFM to breach its Agreement. Under the Guide, incorporated by reference into the Agreement, AFM warranted that:

> No mortgage loan is subject to any right of rescission, set-off, counterclaim, or defense, including the defense of usury, nor will the operation of any of the terms of each Mortgage Note or the related Mortgage, or exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of recession, set-off, counterclaim or defense has been asserted with respect thereto.

(Guide, § 202.4(19)). Western says that the mere fact that the Smerkers raised a usury defense constitutes a breach of this part of the Agreement, regardless of whether the Montana court ultimately determined such a defense was invalid. On the other hand, AFM's interpretation

---

10. Throughout this period Western affirmatively acknowledged on numerous occasions that it would not accept any offer by AFM to cure, but would insist on repurchase of the loan.

11. Such a determination by the Court is not proper on summary judgment because the parties dispute the fair market value of the omitted acreage. AFM claims that the fair market value of the omitted acreage should be set at $71,400, the amount the sale of the land netted the first mortgagee, First State Bank of Havre. Western refuses to admit that this amount necessarily represents the actual fair market value of the real estate because this sale appears to have been a sale by the Smerkers to their son, which was a private sale, not advertised to the public. In light of its current decision, the Court urges the parties to attempt to work this dispute out informally.

12. Even if either of the last two allegations did constitute a breach, the Court's resolution of the remedy issue in Section II.A. of this Memorandum Opinion probably decides each issue in AFM's favor.

would require an actual judicial determination of usury.

The language of the Agreement is not entirely clear on this point. However, Western drafted the Agreement and any ambiguity in the subject provision should be interpreted against it. *See* Cal. Civ. Code § 1654. Furthermore, "[c]ourts should avoid an interpretation which will make a contract unusual, extraordinary, harsh, unjust or inequitable." *Yamanishi v. Bleily & Collishaw, Inc.* 29 Cal.App.3d 457, 462–463, 105 Cal.Rptr. 580, (Cal.App. 1972.) Under Western's interpretation of the warranty provision, liability for breach would turn entirely on forces outside AFM's control—the debtor's decision of what affirmative defenses to raise in a foreclosure action, even one without merit. AFM would be subject to liability for breach of warranty even if the note were ultimately determined not to be usurious. It is unlikely that the contracting parties intended such a result. A party cannot usually warrant against the conduct of an unrelated third party. Rather, their likely intention was to provide protection to Western in event the loan was ever actually declared unenforceable due to usury or some other defense.

Western's interpretation of the agreement would place an extraordinary and highly unusual risk on AFM's shoulders and make AFM the warrantor of events entirely beyond its control. The most logical interpretation consistent with the contractual language is that AFM warrants only that its loans are not *properly* subject to a defense or claim that will render them unenforceable. Thus, AFM is liable for breach of this warranty only in situations where a defense, like usury, actually renders the underlying loan unenforceable in whole or in part. Here, the Smerkers

merely raised the defense of usury. The Montana court never actually determined that the usury defense was valid and Western has not attempted to prove it. The Court concludes that the Smerkers' mere assertion of the usury defense did not constitute a breach of warranty under the Agreement.

### C.

Western's final argument is that AFM breached the Agreement by failing to maintain the appropriate insurance coverage required in the Agreement. Western raised this issue for the first time in its motion for summary judgment.

Under § 201.1(4) of the Guide: "Each seller must have a Fidelity Bond and Error Omissions Policy in force at all time." (Guide, § 201.1(4)). It appears that AFM did maintain an Errors and Omissions Policy during the relevant time period, but that the policy will not cover damages arising out of the counterclaims asserted by Western in this case. Western has presented no evidence regarding how this alleged breach has caused or will cause it to suffer any cognizable damage. Furthermore, Western has presented no evidence that this alleged breach will have any material effect on its rights regarding the Smerker loan. Thus, the Court concludes that the alleged breach is not a material one, and specifically that the alleged breach has no effect on AFM's right to elect a remedy under the Agreement.

### III.

Finally, the Court addresses AFM's argument that it is entitled to summary judgment on its claim that Western owes it $5,849.83 in fees under the terms of the Agreement for loans it serviced (other than the Smerker loan).[13] Western does

---

**13.** In its Complaint, AFM initially alleged that it was also owed servicing fees for the Smerker loan. After recognizing that servicing fees are payable only on Qualified Loans in which the borrower has made a full scheduled pay-

not deny AFM's allegation that it owes these servicing fees in its Answer. AFM supported its motion with the affidavit of Kathy Daily, the president of AFM. In her affidavit, Ms. Daily stated that: "Western is indebted to American Farm in the sum of $5,849.83 for servicing fees attributable to other loans sold to Western pursuant to the terms of the Seller/Servicer Agreement and the Selling and Servicing Guide described in paragraph 7 of Plaintiff's Complaint, all of said loans were paid according to their terms." (Affidavit of Kathy Daily, ¶ 7.) Western failed to come forward with any evidence to rebut Ms. Daily's affidavit. "When a motion for summary judgment is made and supported as provided in this rule [FRCP 56], an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e). Western did not present any evidence to rebut the fact that it owes the claimed servicing fees. Accordingly, AFM is also entitled to summary judgment on this claim.

The Court will enter an Order consistent with this Memorandum Opinion.

ment, an event which never occurred in the case of the Smerker loan, AFM abandoned its claim for servicing fees on the Smerker loan.